# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-KA-00775-SCT

*REGINA DARLENE GARRETT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/12/2004 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| COURT FROM WHICH APPEALED: | PERRY COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | THOMAS RICHARD MAYFIELD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOHN R. HENRY |
| DISTRICT ATTORNEY | JOHN MARK WEATHERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/05/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., GRAVES AND DICKINSON, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1. Regina Darlene Garrett (Regina) appeals from her conviction and life imprisonment sentence for the murder of her husband, Charles Joseph Garrett, Sr. She claims the trial court erred in denying her motion for directed verdict of "not guilty" and in refusing two of her requested jury instructions on circumstantial evidence. Finding no reversible error in the record, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On January 28, 2002, Perry County Deputy Sheriff Edward Bolton responded to a 911 call reporting a shooting at 188 Holliman Road. At the scene, Deputy Bolton observed Joey Garrett, the son of Regina and Charles Garrett, "running around hollering and beating." Deputy

Bolton further observed Charles lying in the doorway between the carport and the residence. Regina told Deputy Bolton that while target shooting Charles sent her inside the house to get a shotgun and bring it to him. She explained that as she was bringing the shotgun to him, she tripped over the couch and fell, causing the gun to discharge and strike Charles.

¶3.     Deputy Mitch Nobles who also responded to the location, took Joey Garrett aside and attempted to calm him. Joey told Deputy Nobles that while riding a four-wheeler with his little sister, he saw his father fall and his mother standing in the doorway with a shotgun.

¶4.     When Chief Deputy Jimmy Dale Smith arrived at the scene, he found in the kitchen a shotgun containing one spent round. Chief Deputy Smith interviewed Regina and, after administering the *Miranda* warnings, obtained from her a 2 ½ page handwritten statement describing the events surrounding the death of her husband. In her statement, Regina claimed that her husband sent her for the gun, and as she was taking it to him, she tripped and fell, causing the gun to accidently discharge, killing her husband. Chief Deputy Smith testified he sent the shotgun he recovered from the kitchen to the state crime lab for a fingerprint examination and a drop test. Starks Hathcock, a forensic scientist specializing in firearms identification for the Mississippi Crime Lab, performed the drop test on the shotgun. Because the shotgun failed to fire after numerous drops, Hathcock concluded that the shotgun could not have discharged without the trigger being pulled.

¶5.     The Perry County Sheriff's Department requested Mississippi Crime Lab senior crime scene analyst Grant Graham to inspect the scene of the shooting. During his investigation, Graham noticed and recorded ricochet marks but was unable to project the trajectory of the

objects which caused them. Additionally, forensic pathologist Dr. Steven Hayne performed an autopsy on Charles's body and concluded that the cause of death was massive blood loss from major vessels secondary to a shotgun wound to the face. Dr. Hayne also concluded that the muzzle of the weapon was 8 to 10 feet from the decedent's face when it was fired, but could not determine from his examination the respective position or body angles of the shooter and deceased at the time the shot was fired. He did state, however, that there was enough evidence for him to exclude accident in this case.

¶6. At trial, several witnesses testified concerning their relationship with Regina Garrett as well as specific conversations in which she related her desire to kill her husband. Rita Smith testified that during December 2000 through the spring of 2001, she and Regina had at least two dozen conversations about having Regina's husband killed. The conversations included details of his possible death such as his having an "accident" doing target practice. ¶7.

Another friend of Regina's, Penny Strickland, testified that Regina stated several times that if Charles Garrett hit her again she would shoot him. Charles Graves testified that while the two worked together, he and Regina had a sexual relationship which lasted about five months. After discovering the affair, Charles Garrett called Graves on several occasions prompting Graves to contact the police. Graves further testified that Regina never discussed with him a plan to kill her husband.

¶8. Louis Young testified that he became acquainted with Regina when they worked together at the Care Center in Laurel, Mississippi. He testified that Regina contacted him to solicit his assistance in getting someone killed and offered to pay him $15,000 from insurance

3

proceeds for his help in bringing about her husband's death. Young arranged a meeting in a Wal-Mart parking lot in Magee, Mississippi, between Regina and a friend of his, Lindsay James, for the two to discuss the possibility of having Regina's husband killed. Young further testified that he never intended to locate someone to kill the deceased and really did not believe Regina was serious about killing her husband. During the meeting, according to James, however, Regina provided a small photo of her husband and told James she wanted her husband killed and offered to pay money from the insurance proceeds in exchange for his death. James testified that he did not receive any money from Regina and denied ever entering into any type of negotiation for the killing of her husband.

¶9. A Perry County Grand Jury indicted Regina Garrett for the deliberate design murder of her husband Charles Garrett, Sr. At the close of the State's case, the trial court denied Regina's motion for directed verdict challenging the sufficiency of the evidence. Regina rested without putting on any proof, and Regina was convicted and sentenced to a term of life imprisonment. The trial court judge denied Regina's Motion for New Trial and for Judgment Notwithstanding the Verdict.

## ANALYSIS

¶10. Regina Garrett presents two issues for this Court to review:

1. Since the defendant was the only eye witness to the homicide and her version was reasonable and uncontradicted in any material particular by credible witnesses, physical facts or facts of common knowledge, her version should have been accepted as true and her motion for directed verdict of "not guilty" should have been granted.

4

2.    The trial court erred in refusing defendant's requested Instruction D-5 as submitted and in refusing defendant's requested Instruction D-6.

### *Motion for Directed Verdict*

¶11.    Regina Garrett asserts that because she was the only eyewitness to the homicide of Charles Garrett, Sr., and because her version of the event was reasonable and uncontradicted, the trial judge should have granted her motion for directed verdict of "not guilty."  Some seventy-two years ago, this Court in *Weathersby v. State*, 165 Miss. 207, 147 So. 481, 482 (1933), held that where a defendant or defendant's witnesses were the only eyewitnesses to a homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the State, or by physical facts or by the facts of common knowledge.  Therefore, we must determine whether Regina presented her version of events and, if so, whether her version of the homicide is reasonable and whether the physical facts and testimony of the State's credible witnesses reveal any inconsistences which substantially contradict her version of the homicide.

¶12.    Regina presented no evidence and called no witnesses following her motion for directed verdict, that is to say, she rested without putting on any proof.  Having put on no proof, she therefore presented no version of the homicide.  Her "version" of the homicide in her January 28, 2002, handwritten statement, and the tape-recorded statement of February 7, 2002, were unsworn statements which were introduced into evidence by the State in its case-in-chief and may not be considered Regina's version of the homicide for purposes of obtaining a *Weathersby* instruction.

5

¶13.    In *Carter v. State,* 221 Miss. 111, 72 So.2d 231, 232 (1954), this Court held that even though the State introduced statements made by Carter in its case, the *Weathersby* rule had no application because Carter neither testified nor offered any witnesses at trial.    Similarly, Regina may not invoke the *Weathersby* rule because she did not establish her version of the homicide through testimony at trial.

¶14.    Regina argues that her version of the facts came into evidence through the statements she made to police.    However, this Court has never held that an unsworn statement to police may be used for purposes of a *Weathersby* analysis.    Thus, Regina's first assignment of error is without merit, and the trial court properly denied her motion for directed verdict.

### Regina's requested Jury Instructions D-5 and D-6

¶15.    Regina's second assignment of error is that the trial court erred in refusing her requested Jury Instructions D-5 and D-6, as submitted.    Both of these jury instructions, which relate to circumstantial evidence, instruct the jury that the prosecution must prove its case beyond a reasonable doubt and to the exclusion of any reasonable hypothesis of innocence in order to convict.    Instruction D-5 as submitted by the Defendant required the jury to find the defendant guilty to "the exclusion of every other reasonable hypothesis."    The State objected to this language, contending that this was not a purely circumstantial evidence case.    The trial court agreed, and we find no error.

¶16.    Instruction D-6, as submitted, instructed the jury regarding the "two theory" circumstantial evidence case.    The court refused this instruction, again noting that this was not

a circumstantial evidence case. This Court has stated that "the so-called 'two theory instruction' . . . should be granted only in a case based entirely upon circumstantial evidence. *State v. Rogers*, 847 So. 2d 858, 863 (Miss. 2003), citing *Kitchens v. State*, 300 So. 2d 922, 926 (Miss. 1974) citing *Coward v. State*, 223 Miss. 538, 78 So. 2d 605 (1955).

¶17. A circumstantial evidence case is one where the State is "without a confession and wholly without eyewitnesses to the gravamen of the offense charged," *Kniep v. State*, 525 So.2d 385, 392 (Miss. 1988). But where the accused has made an admission on an element of the offense, it is no longer a circumstantial evidence case. *Lynch v. State,* 877 So.2d 1254, 1256 (Miss. 2004); *Conner v. State*, 632 So.2d 1239, 1256 (Miss. 1993); *Mack v. State*, 481 So.2d 793, 795 (Miss. 1985). The defendant is not entitled to a circumstantial evidence instruction where both circumstantial and direct evidence are admitted at trial. *Gilleylen v. State*, 255 So.2d 661, 663-64 (Miss. 1971).

¶18. In addition to direct scientific evidence such as fingerprints and DNA, direct evidence has been held to include evidence such as eyewitness testimony, the defendant's confession to the offense charged, or the defendant's admission to an important element thereof. *Lynch*, 877 So.2d at 1265-66; *Conner*, 632 So.2d at 1256; *Mack*, 481 So.2d at 795.

¶19. Regina admitted three times to having shot her husband, causing his death. This qualifies her as an eyewitness to the homicide. Also, several witnesses testified that, on numerous occasions, Regina discussed her desire to kill her husband and the possibility of hiring someone to kill him for money.

7

¶20. Regina's statements to the four people about her desire to kill her husband and her requests for others to kill him constitute an admission of deliberate design which is an element of the crime. This Court has held that a defendant's statement to the police that he thought his partner was going to carjack somebody was an admission against interest, and thus, the capital murder case was not purely circumstantial even though the statement did not constitute a confession. *See Lynch*, 877 So.2d at 1254. *See also Swinney v. State*, 829 So.2d 1225 (Miss. 2002) (confession to a shooting could be direct evidence to an underlying felony for capital murder purposes where defendant admitted to pointing the gun at the victim and stated the gun accidently fired). Our precedent consistently adheres to the rule that *any* direct evidence presented at trial is sufficient to preclude a circumstantial evidence instruction.

¶21. Accordingly, the trial court judge was correct in striking the circumstantial evidence language in Jury Instruction D-5 and in refusing to submit the circumstantial evidence instruction D-6. Regina's second assignment of error is also without merit.

## CONCLUSION

¶22. For these reasons, we affirm the trial court's judgment.

¶23. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY AND CARLSON, JJ., CONCUR. GRAVES AND RANDOLPH, JJ., CONCUR IN PART AND IN THE RESULT. DIAZ, J. NOT PARTICIPATING.**