990 So.2d 206 (2008)
Earlene COLBURN, Appellant
v.
STATE of Mississippi, Appellee.
No. 2005-KA-01882-COA.
Court of Appeals of Mississippi.
January 29, 2008.
Rehearing Denied June 3, 2008.
Certiorari Denied September 11, 2008.
*208 Roy Kenionne Smith, Jackson, attorney for appellant.
Office of Attorney General by Charles W. Maris, attorney for appellee.
Before KING, C.J., BARNES and ISHEE, JJ.
BARNES, J., for the court.
¶ 1. Earlene Colburn appeals her conviction and sentence ordered by the Chickasaw County Circuit Court after a jury found her guilty of murder. Colburn raises ten issues on appeal, including: the admission of certain expert testimony; the ineffective assistance of counsel; the denial of a directed verdict, judgment notwithstanding the verdict or, alternatively, a new trial; and the granting and refusal of certain jury instructions, among other issues. Finding no reversible error, we affirm Colburn's conviction and sentence.

FACTS AND PROCEDURAL HISTORY
¶ 2. At approximately 12:55 a.m. on April 29, 2003, in Houston, Mississippi, firemen arrived on the scene of an extensive trailer-home fire. At this time, the fire involved sixty to seventy-five percent of the home. The home belonged to Petty Childs, an eighty-eight-year-old man who lived with his hired, live-in caretaker, Colburn, who had worked for Childs for approximately fourteen months. At approximately 4:30 a.m., once the fire was extinguished, firefighters recovered Childs's barely recognizable, charred bodily remains. Childs's body was located in *209 what was formerly the den of the home, outside of his bedroom. Later that morning, law enforcement officials questioned Colburn at the home of her daughter, Annie Strevall. Initially, Colburn was not a suspect, and she denied any involvement. However, during several interviews with law enforcement authorities conducted in the days immediately following the fire, it was revealed that Colburn's relationship with Childs was strained. Additionally, Colburn's statements were inconsistent with other witnesses' statements. Moreover, her interviews with law enforcement officials invariably ended with Colburn breaking down into what the interviewers labeled as "temper fits," ranting and raving. Then, in an interview with law enforcement on May 1, 2003, Colburn made the first of several confessions.
¶ 3. In August 2003, a grand jury in Chickasaw County indicted Colburn for the capital offense of murder in the commission of arson, in violation of section 97-3-19(2)(e) of the Mississippi Code Annotated (Rev.2000). Colburn pleaded not guilty. On May 3, 2005, in the Circuit Court of Chickasaw County, Colburn's three-day jury trial began. The trial judge informed the jury that the State was not seeking the death penalty.
¶ 4. The State called nine witnesses in its case-in-chief. First to testify was Brad Smith, who was one of the first fireman on the scene. He testified that upon his arrival, the fire was concentrated in the front portion of the house and was "venting" through the roof above the front door.[1] The firefighters concentrated on extinguishing the fire in the back of the house first, where Childs's bedroom was located. Smith was momentarily able to break into Childs's bedroom, but he did not find Childs. Childs's bed did not appear to have been slept in. Smith then headed outside the house because the fire became too intense to perform any further interior searches. It took over an hour to initially extinguish the fire. Smith testified the fire rekindled the next day, and it took two or three days before the fire was completely extinguished.
¶ 5. Mike Ivy, a deputy state fire marshal with the Mississippi Department of Insurance, testified next. The defense accepted him as an expert witness in arson investigation and crime scene diagrams. Ivy testified he went to Houston the day after the fire to investigate. It was his opinion that the fire originated in the front living room and adjoining den area, and the fire did not originate from any appliances or heaters in the house. He determined that the cause of the fire was from flammable liquid poured in the area the fire originated and was ignited with an "open flame device." Thus, all accidental causes of the fire were excluded. Ivy formulated his conclusion from the irregular burn patterns on the floor that extended in a linear pattern. There was a line of demarcation in this linear pattern, referred to as a "trailer," or "pour pattern," which was not seen in the other areas. This pour pattern, Ivy explained, was indicative of flammable liquid being poured in the area from the front entrance of the home through the living room and back to the adjoining den, where Childs's body was found, and his bedroom. A plat of Childs's home, drawn by Ivy and including the pour pattern, was introduced into evidence, over the defense's objections. On cross-examination, Ivy did admit that the State Crime Laboratory was unable to identify ignitable liquids in the three debris samples *210 taken from the pour pattern area. However, Ivy explained that water used to put out the fire would have diluted the flammable liquid residue. He postulated that this test result merely meant that there was not enough ignitable liquid in the sample to identify what the flammable liquid was, not that there could be absolutely no flammable liquid in the sample.
¶ 6. Next to testify was Childs's long-time neighbor, James Gunn. Gunn testified that when he arrived at home from work[2] on the night of April 28, at 11:30 p.m., he noticed Childs's porch and living room lights were on, which was unusual. Shortly thereafter, while he was taking his garbage out, he noticed Colburn, in a night gown and housecoat, on Childs's front porch, smoking a cigarette.
¶ 7. The prosecution next called deputy sheriff and county coroner, Andy Harmon. Officer Harmon testified that on the evening of the fire, he was on his way to investigate the Childs's fire at approximately 1:20 a.m. when he noticed what was later identified as Colburn's car stuck in a ditch near Strevall's house. Once at the scene, Officer Harmon stated that Childs's house was "thoroughly involved" in fire, and the fire department was trying to extinguish the fire. He notified the police about the vehicle stuck in the ditch, and Houston police officer Eric Chrestman left the scene to check on it.
¶ 8. Officer Harmon was also present at several investigative interviews with Colburn.[3] He testified that the information obtained from Colburn's interviews was inconsistent. He first interviewed her, before she was a suspect, at approximately 6:00 a.m. on April 29 at Strevall's house. At this time, Colburn stated she left Childs's home at approximately 11:00 p.m. on April 28, after putting Childs to bed. She added that Childs told her "his heart was beating funny and that everything was paid up." Later that day, Officer Harmon received a call from the state pathologist, who said the case could be considered a possible homicide. Thus, at Colburn's next interview at the sheriff's office, at approximately 10:50 p.m. on April 29, Colburn was considered a suspect. Two other investigators were present at this interview. Colburn was advised of her Miranda rights and signed a waiver form. At the interview, Officer Harmon testified that authorities were trying to determine basic information, such as, the time Colburn was present at Childs's house and when the fire started. Before flying into a "temper fit" and ending the interview, Colburn stated she left Childs's house at 11:00 p.m., and she went to Strevall's house, among other places. At an investigative interview on May 1, Colburn again signed a form waiving her Miranda rights. Two other investigators were present, and they went back over the time frames with Colburn. Colburn consistently maintained that she left Childs's home at 11:00 p.m., but the places she stated she went before arriving at Strevall's house varied. When confronted about Gunn's statement that Colburn had been seen at the scene after 11:00 p.m., she denied it. At this interview, Officer Harmon stated Colburn confessed that she killed Childs, but then she stated "that is all you wanted to hear any way." In the same interview, Colburn also denied killing Childs several times. Finally, Officer Harmon testified that on February 27, 2004, Colburn, while incarcerated *211 in the Houston jail and having had a temper fit, voluntarily confessed to him that "the old son-of-a-b* * * * should have been dead long before what I did." A signed statement by Officer Harmon, stating such, was entered into evidence, over the objection of the defense.
¶ 9. Joyce Myatt testified next for the State. She has known Childs for approximately twenty years and Colburn for approximately six to eight months. Myatt testified that she and Colburn had a phone conversation at about 9:30 p.m. on April 28 about a carpet shampooer Colburn had rented. Colburn told Myatt she was using it on Childs's vinyl kitchen floor while they spoke. Colburn offered to come clean some of Myatt's rugs that evening. While on the phone, Myatt overheard Colburn and Childs having an argument. Childs was cursing Colburn, and she heard Colburn make the statement that if Childs did not shut up she was going to kill him. However, Myatt was quick to add that "Earlene said things like that all the time," and she did not take the comment seriously. Myatt also testified that Childs was "on [Earlene] all the time." Childs did not like for Colburn to talk on the telephone or "have any pleasure"; he just wanted her to work all the time. Colburn never made it to Myatt's house that evening to clean her rugs. Instead, Myatt received another call from Colburn at approximately 2:30 a.m. April 29 stating, "Mr. Petty is dead." However, Colburn offered Myatt no further details. Colburn did mention that her car was stuck in a ditch. She requested that Myatt have her husband come pull her out, but Myatt declined.
¶ 10. Deputy Sheriff John A. Porter testified for the State regarding his interviews with Colburn. He became involved in the case when he received a phone call the day after the fire from a family member of Childs, who was suspicious of foul play. He attended Officer Harmon's interview with Colburn on the evening of April 29. At this interview, Colburn stated that on the evening of the fire she had not planned to go anywhere and was in her bedroom watching movies and cleaning. Colburn kept a chair against her bedroom door so Childs would not "bother" her. Colburn stated that Childs's doctor was giving him Viagra, and he would come into her bedroom at night and try to molest her. Also, Colburn recounted how Childs was incontinent, but he refused to wear diapers. Therefore, she had to constantly clean up after him. Further, Colburn stated that on the night of the fire, Childs was threatening to beat her with his walking stick. This precipitated their argument that occurred while she was on the telephone with Myatt. She admitted threatening Childs. Officer Porter testified that Colburn changed her story about when she was at Childs's house and when she left. Initially, Colburn said she left Childs's house at 11:00 p.m. to go to Strevall's house. Then, Colburn stated that on the night of the fire, she left Childs's house and went to the home of her brother, Johnny Brooks. Colburn claimed that she then returned to the Childs's house and smoked a cigarette on the front porch. She stated she arrived at Strevall's house at approximately 12:30 a.m., and she got her car stuck in a ditch while attempting to leave. Officer Porter corroborated Officer Harmon's testimony that Colburn confessed during this interview that she killed Childs.
¶ 11. Officer Porter was also present at the next interview with Colburn on the morning of April 30. During this interview, Colburn discussed her numerous exhusbands and the molestation attempts by Childs. Colburn admitted to Officer Porter that Childs called her a "low bred growing whore" while she was on the telephone with Myatt. Colburn also discussed  during *212 her phone conversation with Myatt, and after Childs yelled at her  her fondness for the lyrics of Johnny Cash's song, "Ring of Fire."[4] Additionally, Officer Porter testified in detail about Childs's and Strevall's telephone records from the early morning of April 29, which were obtained by search warrant and subpoena. Childs's phone records showed Colburn conversed on the phone with Myatt from 9:18 p.m. to 9:50 p.m. on April 28. Additionally, Strevall's phone records indicated her phone was in constant use from 1:30 a.m. until 6:30 a.m. Calls were made between Colburn's several sisters, her brother, and aunts, among others.
¶ 12. Kenneth Bailey, of the Mississippi Highway Patrol Bureau of Investigation, testified regarding what he heard during the two interviews with Colburn that he attended. In the April 30th interview, Colburn's demeanor was very emotional as she spoke about her past husbands. Colburn maintained that she left Childs's house at 11:00 p.m. and went several places, finally arriving at Strevall's. Colburn admitted she despised working for Childs because of his sexual advances and incontinence, and she said that she hated him.
¶ 13. Officer Bailey's next interview with Colburn was on May 1, 2003, with Officer Harmon present. Colburn was confronted about some inconsistencies in her story, so she recanted her previous statements. Colburn stated she did not know what time she smoked cigarettes on Childs's front porch. Also, Colburn had no explanation regarding Myatt's statement to law enforcement that Colburn had called her at 2:30 a.m. stating, "Petty is dead," even though Childs's body was not found until after 4:00 a.m. Officer Bailey testified that Colburn's demeanor during this interview was belligerent  she cursed and yelled frequently. Officer Bailey also heard Colburn confess during this interview, but he thought she was being sarcastic.
¶ 14. The jailer for the Chickasaw County Jail, Pam Barnett, testified, over the defense's objection, regarding Colburn's voluntary confession made while Colburn was incarcerated in November 2003. Barnett related how Colburn was cursing another inmate, so Barnett went to Colburn's cell to calm her. Colburn allegedly told Barnett that her sisters wanted her to act crazy so they could admit her into a hospital, but Colburn maintained that she was not crazy  her sisters were the ones that were crazy. She then confessed to killing Childs.
¶ 15. Dr. Thomas Magee also testified for the prosecution. The trial court accepted him, without objection, as an expert witness in the field of pathology. According to the autopsy he performed, Childs's body was charred and blackened with fourth degree burns which went through the skin surface to the internal organs. He opined the specific cause of death was carbon monoxide poisoning from the fire. Additionally, Childs's entire respiratory system was coated with black material, which meant Childs was alive before the fire and breathed in the burning gases during the fire.
¶ 16. Once the State rested, the defense moved for a directed verdict, which was denied. During its case-in-chief, the defense presented seven witnesses. Colburn's daughter, Strevall, testified first. She maintained that she was home from her job at 11:05 p.m. on April 28, and Colburn arrived between 11:15 p.m. and 11:30 p.m. to get a carpet shampooer that *213 Colburn was storing at her house. Strevall testified that this was not unusual as she had just started a new night shift at work, and Colburn knew when she would be home. Strevall testified that beginning at approximately 12:30 a.m. the next morning, she and Colburn were trying to get the car out of the ditch near Strevall's house. They called Colburn's brother, Brooks, to help at approximately 1:40 a.m. At this time, Officer Chrestman came to Strevall's home to inform Strevall of the fire at Childs's home. Strevall denied any knowledge of the fire. Officer Chrestman asked Strevall and Brooks not to let Colburn leave Strevall's home that morning, and Strevall agreed. Strevall also testified that her mother had told her about Childs's sexual advances and her desire to quit her job.
¶ 17. Colburn's aunt, brother, and sister also testified in her defense. Colburn's aunt, Mary Alice Smith, testified that she received a call from Colburn at approximately 2:45 a.m. Smith maintained Colburn's call at this hour was not unusual, and Colburn did not mention anything about a fire. Brooks testified that Colburn called him at approximately 1:30 a.m. to come pull her car out of the ditch. He testified that he arrived at Strevall's house by approximately 1:45 a.m. He was at Strevall's house when Officer Chrestman came by. Mary Adams, another of Colburn's sisters, who was also a dispatcher at the Houston police department, testified that she received a telephone call from Officer Chrestman on the morning of April 29, stating Childs's home was on fire. Officer Chrestman was trying to locate Colburn. Adams arrived at Strevall's home at approximately 2:00 a.m.
¶ 18. The last witness for the defense was Colburn. She discounted the incriminating testimony against her as lies. She testified about her reason for leaving Childs that evening. A few days before the fire, Colburn had bought a steam cleaner and had taken it to Strevall's home. However, Colburn testified that she used a friend's steam cleaner at Childs's home the evening of April 28. Because the friend needed the steam cleaner back the next morning and Colburn had not finished her cleaning, she left Childs's home that evening at 11:00 p.m. in her night clothes to get her steam cleaner from Strevall's home. After leaving Strevall's home, Colburn accidentally ran her car into the ditch. She called her brother, Brooks, for help. She first heard about the fire from Brooks, who had been told about it from Officer Chrestman.
¶ 19. As far as Colburn's relationship with Childs, she stated they "argued like two old married people," but she admitted they were not lovers. She stated Childs was very bossy, but "[w]hen he cussed me, I cussed him right back." However, she insisted she had respect for him, and she "thought the world of Mr. Childs." Colburn testified she did not recall smoking cigarettes on Childs's front porch the evening in question. She maintained she told law enforcement officers Harmon, Bailey, and Porter the same statement. She denied confessing to jailer Barnett. She also denied that she was offended by Childs's sexual advances or physical aggression. She stated that she would merely "laugh at him." The only problem she had with her employment to Childs was the long hours and his desire to have someone at his home constantly. Colburn explained that her discussion of the Johnny Cash song "Ring of Fire" during the telephone conversation with Myatt was coincidental. Colburn did admit to having some emotional problems, and she testified that she was on *214 medication during the trial.[5] Finally, she denied any involvement with Childs's death.
¶ 20. After the defense rested, the jury received its instructions. Included were jury instructions on capital murder, as well as the lesser-included offenses of murder and manslaughter. After deliberating approximately one and one-half hours, the jury returned verdicts of not guilty of capital murder and guilty of simple murder. The trial judge sentenced Colburn to life in prison. Colburn filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial, which was denied. Aggrieved, Colburn now appeals.

DISCUSSION OF ISSUES
¶ 21. Colburn raises ten issues. In our discussion, we will combine issues where appropriate.

1. Whether Colburn received ineffective assistance of counsel in violation of the Sixth Amendment.[6]
¶ 22. Colburn argues that her Sixth Amendment right to effective counsel was violated because her trial counsel failed to investigate the case properly and summon key witnesses. When a party claims ineffective assistance of counsel for the first time on direct appeal, the Mississippi Supreme Court has stated that "the proper resolution is to deny relief without prejudice to the defendant's right to assert the same claim in a post-conviction relief proceeding," because there is usually inadequate evidence in the trial record to support the claim. Willis v. State, 811 So.2d 450, 454(¶ 8) (Miss.Ct.App.2001) (citing Read v. State, 430 So.2d 832, 837 (Miss. 1983)). We reach the merits on an ineffective assistance of counsel issue on direct appeal only if "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." Colenburg v. State, 735 So.2d 1099, 1101(¶ 5) (Miss.Ct.App.1999) (citing Read, 430 So.2d at 841). We find neither factor present in the instant case. Therefore, we decline to address the issue and dismiss it without prejudice.

2. Whether the trial court erred in allowing the expert testimony of Mike Ivy regarding the origin of the fire.
¶ 23. Colburn takes issue with the admission of expert testimony from Ivy, a deputy state fire marshal, who testified for the State. Colburn argues that Ivy testified outside of his area of expertise. Further, Colburn maintains that Ivy's testimony regarding the origin and cause of the fire is inadmissible because there was insufficient evidence to prove these matters. Colburn concludes the evidence was hearsay, speculation, and based on hypothetical *215 information, which confused the jury regarding the possible commission of arson.
¶ 24. This Court's standard of review for the admission or exclusion of expert testimony is an abuse of discretion. Taylor v. State, 954 So.2d 944, 948-49(¶ 15) (Miss.2007) (citing Miss. Transp. Comm'n v. McLemore, 863 So.2d 31, 34(¶ 4) (Miss. 2003)). Therefore, the admission or exclusion of such testimony is within the sound discretion of the trial judge. McLemore, 863 So.2d at 34(¶ 4) (citing Puckett v. State, 737 So.2d 322, 342(¶ 57) (Miss.1999)). Reversal may occur only when the trial court abuses its discretion. Davis v. State, 684 So.2d 643, 661 (Miss.1996) (citing Johnston v. State, 567 So.2d 237, 238 (Miss.1990)).
¶ 25. The admissibility of expert testimony is governed by Mississippi Rule of Evidence 702, which states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
M.R.E. 702. An expert opinion will not be rendered inadmissible if "it embraces an ultimate issue to be decided by the trier of fact," but it is still the discretion of the trial court to determine if the opinion helps the trier of fact. M.R.E. 704; Jenkins v. CST Timber Co., 761 So.2d 177, 181(¶ 18) (Miss.2000) (citing Lentz v. State, 604 So.2d 243, 246 (Miss.1992)).
¶ 26. Ivy's job was to investigate suspicious fires and to determine where the fires started and their causes. In qualifying as an expert witness, Ivy testified he had been doing this type of work for twenty-four years. His training was updated annually. Without any objections by the defense, Ivy was accepted by the trial court as an expert witness in arson investigation and crime scene diagrams, in accordance with the rules of evidence. We find no error in the trial court's acceptance of Ivy as an expert witness in this area.
¶ 27. Ivy proceeded to testify about the origin and cause of the fire. He properly utilized the methods of his training and expertise in arson to formulate an opinion based on the facts he encountered. In his opinion, he determined the area of origin of the fire was the front living room and the adjoining den area. An investigation of the appliances and heaters in the house revealed that they were not the cause of the fire. Over the objection of defense counsel, Ivy also testified about pour patterns noted on the floor in this area. Because these pour patterns indicated a flammable liquid had been poured over the area, Ivy excluded all accidental causes of the fire. While Colburn argues that Ivy's pour pattern testimony was improper because debris samples of the floor in this area did not test positive for flammable liquids, we do not find error. The trial court found Ivy's testimony would assist the jury in understanding the evidence. During cross-examination, Ivy explained the negative test results did not exclude the possibility that there were flammable liquids in the pour pattern; it just possibly meant that there was not enough flammable liquid remaining to create a positive test result.
¶ 28. We find the trial judge did not abuse his discretion in allowing Ivy to testify about the origin and cause of the fire. This issue is without merit.

*216 3. Whether Mississippi Code Annotated section 97-3-19(2)(e) (Rev. 2000) was unconstitutional as applied to this case.
¶ 29. Colburn argues that the State knew evidence of the underlying felony of arson was not present in this case to warrant a conviction of capital murder, but utilized the felony-murder statute nonetheless in order to secure an indictment. This action, Colburn contends, "subjected her to a violation of her constitutional rights," which cannot be considered harmless. She claims the State failed to pursue the arson claim because it provided a jury instruction on murder. Thus, she argues, the capital murder statute was improperly and unconstitutionally utilized by the State.
¶ 30. We fail to see a legal or factual basis to Colburn's argument, as the State presented evidence at trial of pour patterns regarding the origin of the fire. Furthermore, the trial judge gave a jury instruction on the elements of arson (Instruction S-2), indicating the trial court found adequate evidence of arson to create an issue for the jury. Nonetheless, Colburn fails to provide any legal authority for her contentions. Nor does she specify what part of either the United States Constitution or the Mississippi Constitution was violated. The burden is on the appellant to show reversible error to this Court. Clark v. State, 503 So.2d 277, 280 (Miss. 1987) (citing Branch v. State, 347 So.2d 957, 958 (1977)). Appellants therefore have a duty on appeal to make more than mere assertions and must cite legal authority for their arguments. Id. (citing Johnson v. State, 154 Miss. 512, 513, 122 So. 529, 529 (Miss.1929)). This Court is under no duty to consider the merits of issues where no legal authority is cited. Drennan v. State, 695 So.2d 581, 585-86 (Miss.1997). This issue is without merit.

4. Whether the trial court erred in failing to grant certain jury instructions on reasonable doubt, the burden of proof, and the elements of murder and arson; and whether the trial court erred in granting a jury instruction on the lesser-included offense of murder.
¶ 31. This Court's standard of review for considering challenges to jury instructions is as follows:
Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.
Austin v. State, 784 So.2d 186, 192(¶ 18) (Miss.2001) (citing Humphrey v. State, 759 So.2d 368, 380(¶ 33) (Miss.2000)). "[I]f the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." Williams v. State, 803 So.2d 1159, 1161(¶ 7) (Miss.2001) (citing Hickombottom v. State, 409 So.2d 1337, 1339 (Miss.1982)). In sum, "if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." Milano v. State, 790 So.2d 179, 184(¶ 14) (Miss.2001).
¶ 32. Generally, Colburn argues that she had a right to have the jury instructed in accordance with her theory of the case. We proceed to discuss each jury instruction that Colburn challenges.

A. Jury Instruction D-6: Reasonable Doubt.
¶ 33. Colburn offered the following instruction regarding reasonable doubt:

*217 The court instructs the jury for the defendant, that under the law, the term "reasonable doubt," as used by the court in instructions to juries, as the law in the trial of cases, is a sacred and substantial right of this defendant charged with this crime, given and guaranteed unto her by the law of the land, and that such reasonable doubt may rise from the testimony or any part of the testimony, or the lack of testimony, and that under the law, it is the sworn duty of the Jury, and each member thereof, that if there is a reasonable doubt in the mind of any member of this Jury as to the guilt of the defendant, it is your sworn duty to return a verdict of "Not Guilty."
¶ 34. The State objected to this instruction as a confusing attempt to define reasonable doubt, and the State contended that it placed a greater burden of proof on the State than the law requires. The defense countered that there was not another instruction on "reasonable doubt," but the trial judge correctly pointed out that instructions two and three, given by the trial court, mentioned reasonable doubt. The trial judge noted the prohibition in Mississippi from defining reasonable doubt. Therefore, the trial court refused the instruction.
¶ 35. It is a long-standing rule that defining "reasonable doubt" for the jury is improper; instead, "reasonable doubt defines itself." Martin v. State, 854 So.2d 1004, 1009(¶ 12) (Miss.2003) (citing Barnes v. State, 532 So.2d 1231, 1235 (Miss.1988)); Boutwell v. State, 165 Miss. 16, 143 So. 479, 483 (1932). Colburn claims that her instruction does not define reasonable doubt. She contends it merely mentions reasonable doubt, which is proper. However, the State's burden of proof was covered in previous instructions accepted by the trial court. The requirement that the State has the burden of proving the defendant guilty of the various offenses beyond a reasonable doubt was stated in jury instructions C-2, C-3, S-1A, S-2, S-4A1, and S-5A1, all of which were given to the jury. Taken as a whole, other jury instructions which were given by the trial court, more than adequately explain the State's appropriate burden of proof. We find the trial court did not err in excluding instruction D-6.

B. Jury Instruction D-8: Burden of Proof.
¶ 36. Colburn offered another instruction related to the State's burden of proof, which the trial judge refused. Instruction D-8 states:
The court instructs the jury for the defendant that the burden of proof is on the State to prove every material allegation alleged in the indictment beyond a reasonable doubt. If you now believe that the State's evidence is so uncertain or indefinite or if you have a reasonable doubt from such testimony, in your minds, as to the guilt or innocence of the defendant, or if the defendant has raised such doubt by testimony, you should resolve this doubt in favor of the defendant and find Earlene Colburn "Not Guilty."
¶ 37. The instruction suggests if the jury has reasonable doubt over the State's evidence, it may acquit. The State objected to this instruction because it was an improper statement of the law. The trial judge found that the law on the burden of proof was more accurately articulated in prior instructions. Having reviewed the jury instructions referenced in the previous discussion, we find no error in the trial court's exclusion of this instruction.

C. Jury Instruction D-12: Elements of Murder and Arson.
¶ 38. Colburn offered the following instruction:

*218 The defendant, Earlene Colburn, has been charged with the crime of murder and in particular of willfully and maliciously setting fire to or burning or causing to be burned an occupied dwelling house located at 98 Lena Street, Houston, Mississippi, located in the First Judicial District of Chickasaw County, Mississippi and that Petty W. Childs, a human being, died from smoke inhalation from the fire which resulted in the defendant, Earlene Colburn, being charged with the crime of murder.
In the event you find that Earlene Colburn willfully and maliciously set fire to or caused to be burned the occupied dwelling house located at 98 Lena Street, Houston, Mississippi, located in the First Judicial District of Chickasaw County, Mississippi and that as a result of the willful and malicious burning of such house that Petty W. Childs, a human being, died from smoke inhalation, then you shall find the defendant guilty as charged.
If the prosecution has failed to prove any one or more of the above elements beyond a reasonable doubt, then you shall find Earlene Colburn "Not Guilty."
If from the evidence you also find that the State has failed to prove beyond a reasonable doubt all of the elements of the crime of murder as defined in another instruction, then you shall find the defendant "Not Guilty."
¶ 39. The State objected to this instruction as being confusing and misstating the facts. As the State noted, the instruction states Colburn was charged with the crime of murder, and then repeats this fact throughout the instruction. However, Colburn was charged with capital murder. The trial judge thus refused the instruction.
¶ 40. We agree with the State that this instruction is confusing and inaccurate. Furthermore, even if it had been an accurate statement of the law and facts, the trial judge had already allowed instructions on capital murder, murder, manslaughter, and the elements of arson, thereby rendering this instruction repetitious. We find no error in the trial court's refusal of this instruction.

D. Jury Instruction S-4A1: Lesser Crime of Murder.
¶ 41. Colburn takes issue with the following jury instruction on murder, offered by the State and accepted by the trial court:
If you find that the State has failed to prove any one or more of the essential elements of the crime of capital murder, you must find the defendant not guilty of capital murder and you will proceed with your deliberations to decide whether the State has proved beyond a reasonable doubt all the elements of the lesser crime of murder.
If you find from the evidence in this case beyond a reasonable doubt that the deceased, Petty W. Childs, was a living person, and the defendant, Earlene Colburn, did wilfully and of her deliberate design kill Petty W. Childs by purposely causing his death, then you shall find the defendant guilty of murder. In which event you should write your verdict on a separate sheet of paper provided to you by the court for that purpose in the following form, to-wit:
"We, the jury, find the defendant, Earlene Colburn, guilty of murder."
If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the defendant not guilty of murder. In which event you should write your verdict on a separate sheet of paper provided *219 to you by the court for that purpose in the following form, to-wit:
"We, the jury, find the defendant, Earlene Colburn, not guilty of murder."
If warranted by the evidence you may find the defendant guilty of the lesser crime of murder. However, notwithstanding this right, it is your duty to accept the law as given you by the court, and if the facts and the law warrant a conviction of the crime of capital murder, then it is your duty to accept the law as given you by the court, and if the facts and the law warrant a conviction of the crime of capital murder, then it is your duty to make such a finding uninfluenced by your power to find a lesser offense. This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent a failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser crime of murder.
¶ 42. Colburn argues that this instruction ends with improper language in the last paragraph because the language is repetitious. Additionally, Colburn claims the instruction is redundant, as other instructions granted, namely S-4, S-4A, S-5, and S-5A1, cover the same facts and law. However, Colburn is incorrect. According to the record, instructions S-4, S-4A, and S-5 were not given to the jury. These instructions all deal with the lesser-included crimes of the indicted offense, capital murder. Moreover, there is no redundancy between S-4A1 and S-5A1, as S-5A1 deals with the lesser crime of manslaughter, not murder.
¶ 43. Furthermore, jury instruction S-4 went through several modifications and was finally accepted as S-4A1. There was no objection to S-4A1; thus, there is no merit to Colburn's argument. "To preserve a jury instruction issue on appeal, the defendant must make a specific objection to the proposed instruction to allow the trial court to consider the issue." Harris v. State, 861 So.2d 1003, 1013(¶ 18) (Miss.2003) (citing Crawford v. State, 787 So.2d 1236, 1244-45(¶ 35) (Miss.2001)). "[A]n objection on one or more specific grounds constitutes a waiver of all other grounds." Morgan v. State, 741 So.2d 246, 253(¶ 15) (Miss.1999) (citing Stringer v. State, 279 So.2d 156, 158 (Miss.1973)). Colburn is now claiming that the jury instruction given on murder is redundant and confusing. However, failure to raise an issue at trial creates a procedural bar that prohibits review of the issue on appeal. Glasper v. State, 914 So.2d 708, 721(¶ 30) (Miss.2005) (citing Smith v. State, 729 So.2d 1191, 1201(¶ 38) (Miss. 1998)). Since Colburn did not make this objection as to this jury instruction before the trial court, the issue is procedurally barred.
¶ 44. Procedural bar notwithstanding, when considered in totality with the other instructions, this issue is without merit. After examining the record, we find instruction S-4A1, for the lesser-included offense of murder, was supported by the evidence presented at trial; therefore, it was proper. The jury could rationally find Colburn, beyond a reasonable doubt, wilfully and of deliberate design, killed Childs by purposefully causing his death. We find no merit to Colburn's contention that the language in the last paragraph of the instruction was so repetitious as to create an injustice. We find the jury instruction was clear in its meaning.
¶ 45. In conclusion, the instructions granted by the trial judge and presented to the jury, taken as a whole, fairly and accurately presented the law pertaining to the facts and evidence raised in this case. We find no error with the jury instructions given.

*220 5. Whether the trial court erred in failing to advise the jury to disregard the district attorney's comment during closing argument that Colburn failed to call certain witnesses.
¶ 46. The following statements were made during the State's closing argument:
Closing Argument by Mr. Creekmore:
Let's talk about Mrs. Colburn a little bit. She is emotionally unstable. Mr. Childs was difficult. He was a difficult person to live with. But she should have  she should have taken it upon herself to understand that she did not have any business taking care of him. She gets on the stand and tells you that she cared for him, cared for him like a spouse. They were like an old married couple. She did not call a single person to let them know that cared for Mr. Childs.
BY MR. GORE: Object to that comment on failure to call witnesses.
BY THE COURT: All right. Sustained.
BY MR. CREEKMORE: She testified that she never called Mr. Childs's family the night of the fire.
¶ 47. Colburn interprets the district attorney's comments to have meant her failure to call a witness to the stand who cared about Mr. Childs. After a review of the transcript, we find, as the State noted, Colburn has taken the statement out of context and misconstrued its meaning. The district attorney was commenting on Colburn's failure to call by telephone a single person who cared for Childs in the early morning hours after the fire on April 29. Alleged improper comments are to be viewed in context, allowing for the circumstances of the individual case. Ballenger v. State, 667 So.2d 1242, 1270 (Miss.1995). The trial judge sustained the objection, but he did not instruct the jurors to disregard the comment. We find no error in the district attorney's comment. Even if the statement could be interpreted as a comment on a failure to call certain witnesses in court, the question on appeal is "whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused" which causes the jury to reach a decision influenced by the prejudice. Howell v. State, 860 So.2d 704, 762 (¶ 205) (Miss. 2003) (quoting Wells v. State, 698 So.2d 497, 506 (1997)). We find no unjust prejudice resulted from the district attorney's comment. This issue is without merit.

6. Whether the trial court erred in failing to grant Colburn's motion for a directed verdict, motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, motion for a new trial.
¶ 48. Colburn challenges the jury verdict as legally insufficient and not supported by the weight of the evidence. While she raises these issues separately, we shall discuss them together, as the same facts apply to both issues.

A. Sufficiency of the Evidence.
¶ 49. A directed verdict and a motion for JNOV both challenge the sufficiency of the evidence presented to the jury. McClain v. State, 625 So.2d 774, 778 (Miss. 1993). Therefore, our standard of review is the same for both. This Court will consider the evidence in the light most favorable to the State, giving the State "the benefit of all favorable inferences that may reasonably be drawn from the evidence." Collier v. State, 711 So.2d 458, 461(¶ 11) (Miss.1998) (quoting Wetz v. State, 503 So.2d 803, 808 (Miss.1987)). The relevant question then becomes whether "any rational trier of fact could *221 have found the essential elements of the crime beyond a reasonable doubt." Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss. 2005) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). This Court will reverse and render only when the facts point so overwhelmingly in favor of the defendant that reasonable men could not have found, beyond a reasonable doubt, the defendant was guilty. Id. However, all credible evidence supporting the defendant's guilt will be accepted as true. McRee v. State, 732 So.2d 246, 249(¶ 9) (Miss.1999) (citing Wetz, 503 So.2d at 808).
¶ 50. Colburn moved for both a directed verdict, after the State had presented its case-in-chief, and a motion JNOV, after the trial. The trial court denied both motions. Colburn argues that the State's case was based on circumstantial evidence,[7] thus raising the burden of proof for a conviction to a higher standard: the State must prove Colburn's guilt beyond a reasonable doubt and to the exclusion of every other hypothesis consistent with innocence. See Lynch v. State, 877 So.2d 1254, 1268(¶ 34) (Miss.2004). Colburn claims that the State failed to meet this burden. However, this is not a circumstantial evidence case. "A circumstantial evidence case is one where the State is `without a confession and wholly without eyewitnesses to the gravamen of the offense charged.'" Garrett v. State, 921 So.2d 288, 291(¶ 17) (Miss.2006) (quoting Kniep v. State, 525 So.2d 385, 392 (Miss. 1988)). "[W]here the accused has made an admission on an element of the offense, it is no longer a circumstantial evidence case." Id. (citing Lynch, 877 So.2d at 1265(¶ 23)). While the majority of evidence presented at trial was circumstantial, Colburn made three admissible, voluntary confessions that she killed Childs, which were documented and admitted into evidence during her trial, and not contested on appeal.
¶ 51. Colburn also maintains that the State failed to prove that she acted with "malice aforethought." Mississippi's definition of murder, which has not changed since Colburn's trial, is as follows: "The killing of a human being without authority of law by any means or in any manner shall be murder ... [w]hen done with deliberate design to effect the death of the person killed, or of any human being." Miss.Code Ann. § 97-3-19(1)(a) (Rev.2006). The Mississippi Supreme Court has held that malice aforethought and deliberate design mean the same thing. Hawthorne v. State, 835 So.2d 14, 19(¶ 21) (Miss.2003) (citing Windham v. State, 602 So.2d 798, 801 (Miss.1992)). Our analysis of the sufficiency of the evidence is whether the State proved these essential elements of the crime beyond a reasonable doubt. We find, after thoroughly reviewing the record, the trial court did not err in denying Colburn's motions for a directed verdict or JNOV. Among the evidence presented to the jury were three confessions made by Colburn in the presence of three different individuals, evidence of a strained relationship between Childs and Colburn, and Colburn's dislike for both her job and Childs. Furthermore, Dr. Magee testified that Childs's *222 autopsy showed he was alive when the fire started; so he did not die from natural causes before it began.
¶ 52. The evidence in this case, viewed in the light most favorable to the State, establishes a rational jury could have found Colburn affected the death of Childs with deliberate design beyond a reasonable doubt. While certain evidence conflicted about the night of the fire, we must keep in mind that in our review, all credible evidence supporting Colburn's guilt is accepted as true. We find that there was sufficient proof presented at trial to establish the essential elements of murder.

B. Weight of the Evidence.
¶ 53. A motion for a new trial challenges the weight of the evidence. Smith v. State, 802 So.2d 82, 85-86(¶ 11) (Miss. 2001). A high standard of review has been established in this regard: all evidence "consistent with the defendant's guilt is accepted as true together with any reasonable inferences that may be drawn from that evidence." Young v. State, 891 So.2d 813, 821(¶ 21) (Miss.2005) (citing Heidel v. State, 587 So.2d 835, 838 (Miss.1991)). This Court reviews the trial court's denial of a motion for a new trial under an abuse of discretion standard. Johnson v. State, 904 So.2d 162, 167(¶ 11) (Miss.2005). This Court will overturn a verdict only when it "is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice." Id. (citing Esparaza v. State, 595 So.2d 418, 426 (1992)). Evidence will be analyzed "in the light most favorable to the verdict." Bush, 895 So.2d at 844(¶ 18) (citing Herring v. State, 691 So.2d 948, 957 (Miss.1997)). "Any factual disputes are properly resolved by the jury and do not mandate a new trial." Moore v. State, 859 So.2d 379, 385(¶ 26) (Miss.2003) (quoting McNeal v. State, 617 So.2d 999, 1009 (Miss.1993)).
¶ 54. Regarding Colburn's motion for a new trial, her argument centers around her contention that there was no evidence that she caused the fire, thereby causing the death of Childs. She maintains the evidence showed she was not at home before the fire was noticed and reported. Because of the many inconsistencies in the various statements of what happened the night of the fire, not to mention Colburn's confessions, we find that allowing this verdict to stand does not sanction an unconscionable injustice. The trial court did not abuse its discretion in denying Colburn's motion for a new trial.
¶ 55. We conclude that both the weight and sufficiency of the evidence were adequate to convict Colburn of murder.

7. Whether the trial court erred in accepting the jury's verdict.
¶ 56. Colburn claims that because the jury returned a verdict of "not guilty" of capital murder and "guilty" of murder together on the same sheet of paper, the jury did not follow its instructions; thus, the trial court should have rejected the verdicts. The jury instructions granted on capital murder and the lesser-included offenses of murder and manslaughter all stated that the jury's verdicts are to be written "on a separate sheet of paper." During their deliberations, the trial judge received a question from the jury, written on a sheet of paper and given to the bailiff, about the form of the verdict. The jury asked whether it needed to write its verdicts on separate sheets of paper. The trial judge, responding by a written note, stated the jury needed to "[w]rite any necessary verdict(s) on one sheet of paper." He explained to trial counsel that the jury "can return up to three [verdicts], as few as one and as many as three." *223 After deliberating, the jury returned its verdicts in the following form, written on one sheet of paper: "We, the jury, find the defendant, Earlene Colburn, not guilty of capital murder. We, the jury, find the defendant, Earlene Colburn, guilty of murder." After polling the jury, the verdicts were found to be unanimous.
¶ 57. We find no reversible error with the verdicts being written on one sheet of paper instead of two, especially since the trial judge specifically instructed the jurors to submit the verdict in this manner. Moreover, any claim of error regarding the jury not complying with the jury instructions in writing each verdict on a separate sheet of paper we view as harmless.
¶ 58. Colburn further argues that the jury's verdict of not guilty to the charge of capital murder also acquitted her of any underlying and lesser-included offenses, and she should have been discharged "as a matter of law and pursuant to the prohibition against double jeopardy." We reject this argument for two primary reasons. First, the Double Jeopardy Clause protects against three abuses:
(1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction and (3) multiple punishments for the same offense. These protections stem from the premise that an accused should not be tried or punished twice for the same offense. Double jeopardy operates as a bar against repeated attempts to convict, with consequent subjection of the defendant to embarrassment, expense, anxiety, and insecurity, and the possibility that he may be found guilty even though innocent.
Brawner v. State, 947 So.2d 254, 266(¶ 33) (Miss.2006) (internal citations omitted). The clause is thus inapplicable in situations where there is no threat of multiple prosecutions or repeated punishments. See Brawner, 947 So.2d at 266(¶ 34). In Brawner, the Mississippi Supreme Court found no double jeopardy violation where the defendant was convicted of four counts of capital murder and sentenced to death, and the underlying felony was used as an aggravating factor during sentencing. Id. The Brawner court reasoned that the sentencing phase of a capital murder trial was but one part of the whole trial. Id. Similarly, the United States Circuit Court of Appeals for the Ninth Circuit has held that there is no double jeopardy violation when there is a "simultaneous acquittal and conviction of the same offense" by the same jury, as when a defendant was charged for six counts under two subsections of a state statute, and the State litigated the case once under alternative theories. See Williams v. Warden, 422 F.3d 1006, 1012 (9th Cir.2005). The Ninth Circuit stated to do otherwise would "carve out a fourth abuse against which double jeopardy ostensibly protects: the simultaneous conviction and acquittal of the same offense, under different theories, in the same trial by a single jury. Such an extension would not comport with the primary purpose of the Double Jeopardy Clause." Williams, 422 F.3d at 1010.
¶ 59. Second, the initial premise upon which Colburn bases her argument is incorrect. Colburn cites Harris v. State, 723 So.2d 546 (Miss. 1997) for the proposition that acquittal of an indicted offense acts as an acquittal of all lesser-included offenses. In Harris, the supreme court held that a directed verdict of acquittal on a multiple count indictment for deliberate design murder prevented the trial court from continuing on a lesser offense of aggravated assault, when the lesser offense was not specifically plead in the indictment. Harris, 723 So.2d at 548. In State v. Shaw, 880 So.2d 296 (Miss.2004), the supreme *224 court explained that Harris does not apply to lesser-included offenses, but lesser offenses.[8]Id. at 304(¶ 25). Further, the Mississippi Supreme Court has held that Harris does not nullify Mississippi Code Annotated section 99-19-5(1) (Rev.2007), which allows a jury to find a defendant guilty of inferior offenses, "the commission of which is necessarily included in the offense with which [the defendant] is charged." Wolfe v. State, 743 So.2d 380, 387(¶ 37) (Miss.1999). Colburn continues her argument contending she cannot be found guilty of murder when arson was the underlying felony of her capital murder charge. However, again, Colburn's argument is misplaced. She is apparently confusing an underlying felony with a lesser-included offense. Murder is a lesser-included offense of capital murder. See Carter v. State, 799 So.2d 40, 49(¶ 32) (Miss. 2001). The trial court did not err in accepting a verdict of guilty of murder.
¶ 60. In conclusion, we find the verdicts to be consistent with the instructions given. This issue is without merit.

8. Whether Colburn suffered cumulative error in violation of her right to a fair trial.
¶ 61. Colburn contends even if the abovementioned errors standing alone do not constitute reversible error, the cumulative effect of each individual error deprived her of her constitutional right to a fair trial under the Sixth and Fourteenth Amendments of the Constitution.
¶ 62. "[I]ndividual errors, not reversible in themselves, may combine with other errors to make up reversible error." Wilburn v. State, 608 So.2d 702, 705 (Miss. 1992) (citing Hansen v. State, 592 So.2d 114, 142 (Miss.1991)). In analyzing whether there has been cumulative error, our Court acknowledges that an error standing alone may not produce an unfair trial, but when evaluated cumulatively, the errors may produce an unfair trial. Id. We find no error present in the instant case which would violate Colburn's right to a fair trial. Therefore, this issue is without merit.

CONCLUSION
¶ 63. We find no error by the trial court warranting reversal in this case. We dismiss without prejudice Colburn's ineffective assistance of counsel claim. The remaining issues are without merit. Accordingly, we affirm the conviction and sentence.
¶ 64. THE JUDGMENT OF THE CIRCUIT COURT OF CHICKASAW COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN PRISON IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] Childs's home included the original mobile home, which included the living room, kitchen, and Colburn's bedroom, and several additions. One addition, adjacent to the living room, included a den and Childs's bedroom.
[2] Gunn routinely got off work at 10:35 p.m.
[3] The record indicates law enforcement authorities interviewed Colburn once before she was a suspect, on April 29, 2003, at approximately 6:00 a.m., and three other times after she was considered a suspect: on April 29 at approximately 10:50 p.m., April 30 at approximately 9:30 a.m., and May 1, 2003.
[4] The lyrics to this song state, in part: "I fell into a burning ring of fire/ I went down, down, down/And the flames went higher/ And it burns, burns, burns/ The ring of fire."
[5] The record indicates an order had been entered continuing Colburn's arraignment due to a pending psychiatric evaluation; however, the results are not contained in the record.
[6] We take note of several inaccuracies in Colburn's brief regarding her ineffective counsel claim. She finds error in her defense counsel's failure to offer an instruction on manslaughter. However, an instruction on manslaughter was offered by the State and accepted by the trial judge, as jury instruction S-5A1. She also states defense counsel never objected during trial to any evidence or testimony presented at trial, which is an inaccurate statement. Our review of the trial transcript shows numerous objections by defense counsel. Further, Coburn criticizes a "one page motion for J.N.O.V."; however, in our record, this motion is four pages long.
[7] We note that Colburn states in her brief that at a later time she will raise as a separate issue the fact the court did not grant instruction D-1 on the burden of proof for a circumstantial evidence case. Yet, Colburn never does raise this issue; thus, we do not consider it. However, we note that Mississippi case law states the "defendant is not entitled to a circumstantial evidence instruction where both circumstantial and direct evidence are admitted at trial." Garrett v. State, 921 So.2d 288, 292(¶ 17) (Miss.2006) (citing Gilleylen v. State, 255 So.2d 661, 663-64 (Miss.1971)).
[8] Longstanding precedent in Mississippi holds assault is not a lesser-included offense of murder. Shaw, 880 So.2d at 304(¶ 25) (citing Wolfe v. State, 743 So.2d 380, 387(¶ 37) (Miss. 1999)).