ROBERTS, J., for the Court.
 

 ¶ 1. A jury sitting before the Jackson County Circuit Court found Karrie Lin-nette Glenn guilty of the murder of her husband, Roy Anthony Glenn (Tony), as an accessory-before-the-fact because she encouraged and persuaded David Stokes to kill Tony. The circuit court sentenced Kar-rie to life in the custody of the Mississippi Department of Corrections (MDOC). Aggrieved, Karrie appeals and raises three issues. First, Karrie claims that the circuit court erred when it refused one of her proffered jury instructions. Additionally, Karrie claims that there was insufficient evidence to support the jury’s verdict. Within the same argument, Karrie argues that the jury’s verdict is contrary to the weight of the evidence. Finally, Karrie urges this Court to remand this matter for a new trial due to the cumulative effect of errors. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. By all appearances, Tony and Karrie were unassuming residents of Jackson County, Mississippi. As of the summer of 1998, they had been married for approximately eight years. They had two young children: a six-year-old daughter, Samantha, and a one-year-old son, Ryan. Tony worked as a truck driver for Clark Seafood, and Karrie worked as a home-health nurse.
 

 ¶ 3. The events that led to Karrie’s conviction were set into motion on Monday, July 27, 1998. On weekdays, Tony’s grandmother, Marjorie Glenn (Marjorie), kept Ryan while Karrie tended to her duties as a home-health nurse. Tony kept Samantha when he was not driving.
 
 [1]
 
 Otherwise, Samantha went to daycare during the summer. Tony was not driving that Monday morning. Even so, Karrie called Marjorie early that morning and asked whether she could keep both Ryan and Samantha. Marjorie did not object. Tony was asleep when Karrie left and took both children to Marjorie’s house. Karrie saw her first patient at approximately 8:00 a.m. She was with that patient for approximately an hour.
 

 ¶ 4. Karrie was tending to her second patient when her pager went off at 9:17 a.m. She called the number on her pager and spoke with one of her neighbors, Rufus Young (Rufus), who told her that “something was wrong with Tony” and
 
 *577
 
 that she needed to come home. Rufus did not tell Karrie what was wrong with Tony, and Karrie did not call home to determine what was wrong.
 

 ¶ 5. At approximately 10:50 a.m. — over an hour after she had spoken to Rufus— Karrie arrived at her home. Numerous law enforcement officers with the Jackson County Sheriffs Department were there. Karrie was not allowed inside her home at that time because Tony had been killed. To be specific, Tony had been shot twice.
 

 ¶ 6. Karrie later went inside the house and reported that a shotgun was missing from the home. Later, Todd Johnson (Todd), a family friend, drove Karrie to the home of Tony’s parents, Roy and Sharon Glenn. Along with other friends and relatives, Stokes, the former boyfriend of Tony’s and Karrie’s niece, went to Roy and Sharon’s house to offer his condolences.
 

 ¶ 7. The subsequent investigation revealed that all was not as it seemed in the Glenn household. Authorities interviewed Todd, who had discovered Tony’s body. According to Todd, Karrie had visited his house the night before Tony was killed. Todd reported that, during Karrie’s visit, she said that she had found what she thought to be a hotel key in Tony’s pocket. Todd also reported that Karrie was concerned that Tony was having an affair. Todd told investigators that he went to Tony’s house that morning to see how Tony was doing.
 

 ¶ 8. During subsequent interviews, Todd elaborated and revealed to Detective Sergeant Dean Reiter, the lead investigator during the 1998 investigation, that he also wanted to see if Tony “wanted to burn one with him.” That is, Todd wanted to see if Tony wanted to smoke marijuana with him.
 

 ¶ 9. In addition to possible marital disputes, the investigation revealed that Kar-rie had a second source of income aside from her wages as a home-health nurse. Karrie sold marijuana when she was not tending to her patients. Not only that, Stokes assisted Karrie in her illegal venture. Although Karrie was not a suspect at that time, Detective Sergeant Reiter interviewed Karrie. Karrie revealed that approximately one month before Tony was killed, she had bought ten pounds of marijuana from Wayne Young (Wayne), a commercial fisherman as well as a neighbor of the Glenns’ and Rufus’s cousin. According to Karrie, Stokes weighed the marijuana and divided it so it could be sold in smaller portions. Karrie later refused to pay Wayne for all of the marijuana because, according to her and Stokes, the marijuana Karrie had purchased from Wayne was fourteen ounces less than ten pounds. This caused a dispute between Karrie and Wayne; Karrie refused to pay Wayne for those fourteen missing ounces of marijuana, and Wayne did not believe that Karrie did not receive the entire ten pounds of marijuana.
 

 ¶ 10. Karrie corroborated Todd’s statements that she and Tony had a dispute the day before Tony was killed. She also corroborated Todd’s statement that she went to his house the evening before Tony was killed; however, she added that Stokes was with her. According to Karrie, she and Stokes left Todd’s house at approximately 9:00 p.m. and went back to her house. Karrie stated that Stokes left, and she and Tony reconciled after their dispute.
 

 ¶ 11. As for the events on the day that Tony was killed, Karrie reported that Stokes arrived at her house at approximately 6:30 a.m. She explained that she left at 6:45 a.m., dropped off her children, and tended to her patients. Karrie also explained that she received a page and called Rufus, who told her that something
 
 *578
 
 had happened to Tony. Karrie indicated that she thought Wayne had killed Tony. Three days after Tony’s death, Wayne was arrested as he returned from a commercial fishing trip. However, Wayne had an alibi. He could not have killed Tony because he left on his commercial fishing trip before Tony was killed and had not returned until he was arrested. Wayne also indicated that Stokes and Karrie might have had a physical relationship. Both Karrie and Stokes denied that they had such a relationship.
 

 ¶ 12. During Stokes’s interviews, he denied having any involvement in Tony’s death, but he also indicated that Wayne had something to do with Tony’s death. Detective Sergeant Reiter obtained consent to search the house where Stokes lived with his mother. Some of Stokes’s clothing and three unfired twelve-gauge-shotgun shells were seized.
 

 ¶ 13. Meanwhile, Karrie arranged Tony’s funeral with the help of her mother and Tony’s mother, Sharon. At Karrie’s request, Todd and Stokes were pallbearers at Tony’s funeral. However, Stokes became distraught at the funeral and was unable to perform his function as a pallbearer. Three days later, Stokes moved to Charleston, South Carolina.
 

 ¶ 14. Afterward, Karrie’s and Tony’s extended family packed up the house for Karrie and the children, and Karrie proceeded to raise the children in another home. Authorities were unable to determine who had killed Tony. The case became cold.
 

 ¶ 15. The investigation became productive again, albeit unexpectedly in 2007, when Lieutenant Ken McClenic spoke with Ronald Allen, an inmate in Greene County. The record is unclear exactly how Allen came to speak with authorities about Tony’s murder. In any event, Allen told Sergeant Mike Ballard and Lieutenant McClenic that he had talked to Stokes shortly after Tony was killed. According to Allen, Stokes called him and asked him if he knew anyone who wanted to buy a shotgun. Allen later testified that, when he spoke with him on the phone, Stokes “was kind of scared. He said he messed up, but he didn’t say what. He just said he [had] messed up[,] and he was fixing to move to South Carolina[,] and he needed to sell a gun.”
 

 ¶ 16. Lieutenant McClenic obtained a warrant for Stokes’s arrest and traveled with Sergeant Ballard to Charleston, South Carolina. On August 20, 2007, Lieutenant McClenic interviewed Stokes. During that interview, Stokes told Lieutenant McClenic that he had a sexual relationship with Karrie that began when Kar-rie was three months pregnant with her son. According to Stokes, their sexual relationship continued until the time that Tony was killed.
 

 ¶ 17. Stokes confessed that he killed Tony. However, Stokes indicated that he had done so at Karrie’s request. Stokes also told Lieutenant McClenic that Karrie was in another room of the home at the time he killed Tony. According to Stokes, on the night before Tony was murdered, Karrie asked him to kill Tony. Stokes reported that after Karrie left the children with Marjorie, Karrie returned home and met Stokes. Stokes stated that Karrie handed him the murder weapon shortly before he killed Tony. According to Stokes, he killed Tony because Karrie told him that Tony had hit her. Stokes also stated that he killed Tony because he loved Kar-rie. The next morning, Lieutenant McClenic and Sergeant Ballard transported Stokes back to Jackson County, Mississippi.
 

 ¶ 18. Stokes and Karrie were subsequently indicted for murder. Karrie pled
 
 *579
 
 “not guilty.” Stokes agreed to testify against Karrie in exchange for being allowed to plead guilty to manslaughter rather than murder and being sentenced to the maximum allowable sentence for manslaughter.
 

 ¶ 19. On August 12, 2008, Karrie went to trial. The prosecution called thirteen witnesses. Six witnesses were either first responders or law enforcement officers who had participated in either the 1998 investigation or the 2007 investigation. Patrol Captain Bryan Grady, Chief Investigator Mick Sears, and former Detective Sergeant Reiter testified regarding their participation in the 1998 investigation. Paramedic William Leidigh testified that he pronounced Tony dead. Sergeant Ballard and Lieutenant McClenic testified regarding the 2007 investigation.
 

 ¶ 20. Additionally, the prosecution called two of Tony’s relatives to testify regarding the events that had occurred on the day that Tony was killed. Tony’s grandmother, Marjorie, testified as to the events the morning that Tony was killed. Tony’s aunt, Brenda Carpenter (Brenda), testified that she saw Karrie and Stokes together in a bedroom at Tony’s parents’ house on the evening that Tony was killed. Brenda testified that Karrie and Stokes “were sitting on the floor, facing each other, and it looked like they were speaking to each other in like a quiet, hushed voice.” Although Brenda could not hear what they were saying, neither one of them were crying or upset.
 

 ¶ 21. Dr. Paul McGarry, a forensic pathologist, testified as the prosecution’s expert witness. Dr. McGarry performed Tony’s autopsy. Dr. McGarry testified that Tony had been shot twice. Based on the scene, Dr. McGarry opined that Tony was lying on the bed when he was hit with the first shot. That first shot, a “slug,” entered Tony’s body just beneath his left arm at the left upper portion of his back. Dr. McGarry testified that the first shot produced a “contact wound,” meaning that “the end of the barrel of the shotgun was against the skin when the shot was fired.” Dr. McGarry went on to testify that Tony “would have been able to feel pain and to react to it, and to move his position from where he was originally up on the bed.” Additionally, Dr. McGarry testified that the first shot probably would not have been fatal.
 

 ¶22. Dr. McGarry testified that the second shot, which was packed with lead shot that was approximately an eighth of an inch in diameter, was also a “contact wound.” According to Dr. McGarry, the second shot entered the front of Tony’s chin and went through his jaw, his teeth, the bones in his neck, his spinal cord, and finally out of the back of Tony’s neck. Dr. McGarry testified that the second shot caused “immediate, devastating paralysis.”
 

 ¶ 23. The prosecution also called Rufus, Wayne, and Todd. The testimony of those witnesses will be discussed in much greater detail below. For brevity’s sake, it should suffice to say that those three witnesses testified regarding Karrie and Stokes’s marijuana business, the dispute between Wayne and Karrie, the events that had occurred the day before Tony was killed, and the events that had occurred on the day that Tony was killed.
 

 ¶ 24. Additionally, the prosecution called Stokes. Stokes testified that he had met Karrie approximately two years before Tony was killed. Stokes further testified that he had met Karrie through Kar-rie’s niece, whom he had dated “[o]ff and on for about a year.”
 

 ¶ 25. Stokes testified that Karrie was three months pregnant when they started having a sexual relationship. According to Stokes, he and Karrie had sex “hundreds”
 
 *580
 
 of times, and they continued their affair until he killed Tony. Stokes testified that Tony was not aware of the affair.
 

 ¶ 26. Stokes also testified that he began to sell marijuana for Karrie when she and Tony moved into the house in which Tony was killed. Stokes testified that he drove Karrie around when she collected drug money and that Karrie “was the boss [and he] was the errand boy.” Stokes testified that he briefly worked as a deck hand on Rufus’s fishing boat, but a couple of months before Tony’s death, “Rufus wanted him to ‘help him clean out a net one day and [he] didn’t help him, so [Rufus] fired [him].’ ”
 

 ¶ 27. Additionally, Stokes testified regarding events that added to the dispute between the Glenns and Wayne. Stokes testified that he “got caught with some dope” approximately two months before Tony was killed. Based on an offer to drop the charges against him in exchange for his cooperation, Stokes agreed to “set two people up.” Wayne was one of the people he “set up.” Stokes and an undercover narcotics officer went to Wayne’s property and “bought two ounces of dope” from Wayne. According to Stokes, Wayne believed that it was Tony who had set him up, when it was actually Stokes. Stokes also testified that Karrie had received ten pounds of marijuana from Wayne, but she refused to pay Wayne for all of it because, according to Karrie, it was “short.”
 

 ¶ 28. Stokes testified regarding the events that took place on the night before Tony was killed. He testified that he drove Karrie to two houses for marijuana-related visits and that Karrie and Tony argued before they left. After he took Karrie home and left the Glenns’ house, Karrie called him twice at sometime between 10:00 p.m. and 2:00 a.m. the next morning. During the first call, Karrie asked him to make sure she woke up in time for work the next morning. During the second phone call, Karrie “said that Tony had hit her, slapped her around, and they had been arguing about the hotel room key[J” According to Stokes, Karrie told him that “she told me she was tired of [Tony] hitting on her, and she asked [him] if [he] would kill [Tony].” Stokes told Kar-rie that he would kill Tony. He testified that he agreed to kill Tony because he “was in love with [Karrie].”
 

 ¶ 29. The next morning, Stokes arrived at Karrie’s house, “probably about 6:00.” Karrie was already awake and preparing the children to go to Marjorie’s house. Stokes testified that Karrie told him “to go across the street and wait” for her to return. Karrie then took the children to Marjorie’s house while Stokes waited for her to return.
 

 ¶ 30. Stokes waited across the street for approximately thirty to forty-five minutes before he left. Karrie returned to the home, called Stokes, and “told [him] to come on.” Stokes went back to Karrie’s and Tony’s house, where Karrie was already inside. Tony testified that the following then transpired:
 

 When I got there, I walked inside[,] and she was standing by the couch. I walked in. She asked me if I loved her. I told her, yeah. She handed me a shotgun. She told me, she said, well, then do it. I took the shotgun and made sure it was loaded, walked down the steps, walked down in there and shot him twice and killed him.
 

 According to Stokes, Karrie was in the living room when he killed her husband.
 

 ¶ 31. Stokes elaborated and explained that the shotgun was on the couch when he returned to the house and that Karrie picked it up and handed it to him. When Stokes shot Tony the first time, Tony was asleep. Stokes testified that he shot Tony
 
 *581
 
 underneath his arm. Tony woke up and said, “oh, my God.” Stokes testified that he then shot Tony in the chin. Tony fell at the foot of his bed and did not move again. Stokes picked up the spent shotgun shell and went in the living room where he gave the shotgun and the spent shell to Karrie.
 

 ¶ 32. According to Stokes, Karrie put the shotgun in the trunk of her car and told him that they “needed to get the dope and money out of [the laundry room].” They got “a few thousand dollars” and what Stokes estimated to be “three or four pounds of dope.” They put the money and drugs in Karrie’s trunk. When Stokes left, Karrie was still there. Stokes testified that he and Karrie left in separate vehicles at approximately 7:15 a.m. After they left, Stokes testified that he saw Kar-rie stop at a bridge and open her trunk, although he did not see her take anything out of the trunk.
 

 ¶ 33. Stokes testified that he took measures to create the appearance that he had an alibi. He next heard from Karrie when she paged him later that day. Kar-rie “was at Tony’s mom’s” house when she paged him. Stokes proceeded to Tony’s parents’ house, where he saw Todd and talked alone with Karrie in a bedroom for ten to twenty minutes. During that conversation, Karrie told him to deny that they had a sexual relationship if asked by police. According to Stokes, “[s]he told me to keep my mouth shut and don’t tell them nothing [sic].”
 

 ¶ 34. When questioned by authorities, Stokes told them that he thought Wayne had killed Tony. He later told Karrie what the authorities were asking him. Three days after Tony’s funeral, Stokes moved to Charleston, South Carolina. Approximately ten years later, Stokes confessed that he killed Tony.
 
 [2]
 

 ¶ 35. Karrie called three witnesses. Allen testified that Stokes offered to sell him a shotgun shortly before he moved to Charleston, South Carolina. Bill East, a retired police officer and the former chief investigator for former Mississippi Attorney General Mike Moore, testified that he drove the route Karrie claimed she took on the morning that Tony was killed. Finally, Karrie testified in her own defense. Karrie testified that she had nothing to do with Tony’s death. She admitted that she sold marijuana. Additionally, she admitted that she had had a sexual relationship with Stokes, but she claimed that they had only had sex twice, rather than hundreds of times as Stokes reported. Karrie testified that she told authorities that she and Stokes were not having an affair because, at the time she was asked, she and Stokes were not having a sexual relationship.
 

 ¶ 36. As previously mentioned, the jury found Karrie guilty of murder. The circuit court sentenced Karrie to life in the custody of the MDOC. Karrie appeals.
 

 ANALYSIS
 

 I. PROFFERED JURY INSTRUCTION D-5
 

 ¶37. At trial, Karrie proffered a jury instruction designated as D-5. Instruction D-5 reads as follows:
 

 The law presumes a Defendant to be innocent of the crime charged. Thus a Defendant, although accused, begins the trial with a “clean slate” — with no evidence against him. And the law permits nothing but legal evidence presented before the Jury to be considered in sup
 
 *582
 
 port of any charge against the accused. So the presumption of innocence alone is sufficient to acquit a Defendant, unless the Jurors are satisfied beyond a reasonable doubt of the Defendant’s guilt after careful and impartial consideration of all of the evidence in the case.
 

 It is not required that the State prove guilt beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reasonable and common sense, the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of her own affairs.
 

 The Jury will remember that a Defendant is never to be convicted on mere suspicion or conjecture.
 

 The burden is always upon the State to prove guilt beyond a reasonable doubt. This burden never shifts to a Defendant; for the law never imposes upon a Defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.
 

 So, if the Jury, after careful and impartial consideration of all of the evidence in the case, has a reasonable doubt that a Defendant is guilty of the charge, it must acquit. If the Jury views the evidence in the case as reasonably permitting either of two conclusions — the Jury should of course adopt the conclusion of innocence.
 

 ¶ 38. During the jury instruction conference, the circuit court judge refused proffered jury instruction D-5 on the basis that it was “set out in Court’s instruction C-l.” There was no further discussion of proffered jury instruction D-5. Karrie claims the circuit court committed reversible error when it refused proffered jury instruction D-5. Our standard of review is as follows:
 

 Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case[;] however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.
 

 Agnew v. State,
 
 788 So.2d 699, 702(¶ 6) (Miss.2001).
 

 ¶ 39. According to the State, because Karrie did not object when the circuit court refused proffered jury instruction D-5, she is procedurally barred from raising this argument on appeal. As authority for its position that Karrie is procedurally barred from raising this issue, the State cites
 
 Baker v. State,
 
 930 So.2d 399, 412-13(¶ 30) (Miss.Ct.App.2005). In
 
 Baker,
 
 this Court addressed a claim that a trial court erred when it determined that a defendant “had voluntarily absented himself from trial without conducting an evi-dentiary hearing with sworn witness testimony.”
 
 Id.
 
 at 412(¶ 29). This Court found that the defendant’s attorney “did not object to the court’s subsequently receiving the unsworn representations of [the defendant’s] father and [the defendant’s] bail bondsman [and that] [h]ad he done so, the trial court could easily have placed the witnesses under oath and avoided the error [the defendant] now claims.”
 
 Id.
 
 at (¶ 30). Accordingly, the State’s citation to
 
 Baker
 
 is based on the broad conceptual language that “[fjailure to make a contemporaneous objection and allow the trial court opportunity to cure the defect is a procedural bar and constitutes a waiver of the argument on appeal.”
 
 Id.
 
 (citations omitted).
 

 
 *583
 
 ¶ 40. However, nothing in
 
 Baker
 
 pertains to whether the procedural bar applies when a defendant submits a proffered jury instruction and does not object when a trial court refuses the defendant’s proffered jury instruction. Contrary to the State’s assertion, one who unsuccessfully submits a proffered jury instruction need not object to a trial court’s refusal of that instruction.
 
 Duplantis v. State,
 
 708 So.2d 1327, 1340(¶ 52) (Miss.1998). A party is only required to tender a proffered jury instruction “in order to preserve review.”
 
 Id.
 
 Having resolved that Karrie did not waive this issue by failing to object to the circuit court’s refusal of proffered jury instruction D-5, we move forward to the merits of Karrie’s claim.
 

 ¶ 41. The vast majority of the substance of proffered jury instruction D-5 was addressed in jury instruction C-l, but unlike proffered jury instruction D-5, jury instruction C-l did not attempt to define reasonable doubt. Karrie argues that the circuit court erred by refusing proffered jury instruction D-5 because no other jury instruction properly defined reasonable doubt. However, “[i]t is a long-standing rule that defining ‘reasonable doubt’ for the jury is improper.”
 
 Colburn v. State,
 
 990 So.2d 206, 217(¶ 35) (Miss.Ct.App.2008). “The Mississippi Supreme Court has repeatedly and consistently asserted that reasonable doubt defines itself.”
 
 Lett v. State,
 
 902 So.2d 630, 638(¶ 27) (Miss.Ct.App.2005) (citations and quotations omitted). Instructions that attempt to define reasonable doubt are prohibited because, among other reasons, such instructions tell “jurors that they should be able to state a reason why they have a doubt ... [; however], in our jurisprudence, jurors are never required to articulate any explanation of their decision.”
 
 Id.
 
 at (¶ 28).
 

 ¶ 42. Aside from defining or elaborating on the concept of reasonable doubt, proffered jury instruction D-5 included language that has been described as a “two-theory” charge. That is, a portion of proffered jury instruction D-5 would have instructed the jury that if it viewed the evidence “as reasonably permitting either of two conclusions,” it was to “adopt the conclusion of innocence.” However, “it is only in cases consisting entirely of circumstantial evidence that an instruction must be given which requires the jury to resolve, in favor of the accused, doubt over circumstances susceptible of two interpretations.”
 
 Conley v. State,
 
 790 So.2d 773, 791(¶ 66) (Miss.2001).
 

 ¶ 43. “The rule in Mississippi is that a circumstantial[-]evidence instruction should be given only when the prosecution can produce neither eyewitnesses [nor] a confession to the offense charged.”
 
 Stringfellow v. State,
 
 595 So.2d 1320, 1322 (Miss.1992). There was direct evidence of Karrie’s guilt. Stokes testified that Karrie asked Stokes to kill Tony and that she planned to have him kill Tony that morning. Additionally, Stokes testified that Karrie handed him the loaded shotgun after she made certain that Samantha would be out of the house and that she waited in the living room while Stokes killed her husband at her request. Based on the presence of direct evidence, the circuit court did not err when it refused proffered jury instruction D-5. We find no merit to this argument.
 

 II. SUFFICIENCY AND WEIGHT OF THE EVIDENCE
 

 ¶44. In this issue, Karrie claims that the verdict is contrary to the overwhelming weight of the evidence. Additionally, Karrie seems to argue that the evidence was legally insufficient to support the con
 
 *584
 
 viction.
 
 [3]
 
 We first address Karrie’s argument regarding the legal sufficiency of the evidence.
 

 A. Sufficiency of the Evidence
 

 ¶ 45. Karrie claims the circuit court erred when it denied her motion for a “judgment of acquittal,” which we have interpreted as a motion
 
 for
 
 a judgment notwithstanding the verdict. “A motion for a judgment notwithstanding the verdict is a challenge to the sufficiency of the evidence.”
 
 Gilbert v. State,
 
 934 So.2d 330, 335(¶ 9) (Miss.Ct.App.2006). As our Mississippi Supreme Court has stated:
 

 in considering whether the evidence is sufficient to sustain a conviction in the face of a motion for [a] directed verdict or for [a] judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.... [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Should the facts and inferences considered in a challenge to the sufficiency of the evidence point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is for the appellate court to reverse and render.
 

 Bush v. State,
 
 895 So.2d 836, 843(¶ 16) (Miss.2005) (internal citations and quotations omitted). However, this Court will determine that there was sufficient evidence to sustain the jury’s verdict if the evidence was “of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense.”
 
 Id.
 
 (internal citations and quotations omitted).
 

 ¶ 46. Stokes’s testimony, as related above, unquestionably contained sufficient evidence that Karrie encouraged him to kill Tony. Stokes testified that: she persuaded him to kill Tony; they planned to kill Tony the next morning; she ensured that the children were not there; and she handed him the shotgun and told Stokes to kill her husband if Stokes loved her. Stokes also testified that Karrie actively concealed their crime and attempted to implicate Wayne.
 

 ¶ 47. Stokes was not the only witness who implicated Karrie. Wayne testified that Karrie spoke to him about being “rid” of Tony. According to Wayne, approximately three to four weeks before Tony was killed, Karrie told him that she wanted to divorce Tony, but “the only way she would be rid of [Tony] [was] if he would be dead.” When Wayne recommended getting a restraining order against Tony if he
 
 *585
 
 did, in fact, abuse Karrie, Karrie “got up and left out of the house.”
 

 ¶ 48. Tony’s grandmother, Marjorie, testified that Karrie called her at approximately 6:00 a.m. on the day that Tony was killed. According to Marjorie, Samantha typically stayed with Tony during the day. Marjorie also testified that Karrie left the children at her house at approximately 6:30 a.m. Marjorie’s testimony contradicted Karrie’s testimony that she did not wake up until 6:30 a.m. on the day that Tony was killed. Stokes corroborated Marjorie’s testimony when he stated that Karrie was awake when he arrived at the house around 6:00 a.m. Additionally, Marjorie’s testimony demonstrated that Karrie took measures to ensure that Samantha was not at home when Stokes killed Tony.
 

 ¶ 49. Marjorie also testified that Karrie called her “right around” 9:30 a.m. and repeatedly said, “they’ve killed Tony.” However, the evidence indicated that Rufus merely told Karrie that “something was wrong” with Tony. Rufus did not tell Karrie that Tony was dead or that he had been killed. The evidence also indicated that Karrie did not arrive at her house until 10:50 a.m. Accordingly, Karrie told Marjorie that Tony had been killed one hour and twenty minutes before Karrie arrived at the home and was notified that Tony had been killed.
 

 ¶ 50. What is more, Marjorie’s testimony that Karrie said, “they’ve killed Tony,” could have reasonably been considered as evidence that Karrie planned to use the marijuana dispute with Wayne as a means to implicate Wayne and divert attention from herself. Similarly, Todd testified that on the afternoon that Tony was killed, Karrie told him that she knew “they were going to do something to Tony.” According to Todd, Karrie was referring to Wayne. Not only that, Wayne testified that he talked to Stokes at Tony’s parents’ house and that Stokes was crying as he hugged Todd and said “we’re going to get them.”
 

 ¶ 51. However, Wayne testified that he saw Karrie and Stokes in the parking lot of Clark Seafood the night before Tony was killed. The jury could have reasonably concluded that Karrie and Stokes were attempting to ensure that Wayne was coming in from work and, therefore, could reliably be implicated in Tony’s death. Despite their surveillance, Karrie and Stokes misinterpreted Wayne’s trip to his truck, as he was merely getting clothes for his extended fishing trip in the Gulf of Mexico. Accordingly, Wayne had a credible alibi on the day that Tony was killed.
 

 ¶ 52. Tony’s aunt, Brenda, testified that on the day Tony was killed, she saw Karrie and Stokes together in a bedroom at Tony’s parents’ house. According to Brenda, “they were sitting on the floor, facing each other, and it looked like they were speaking to each other in like a quiet, hushed voice.” Brenda testified that she could not hear what they were saying, but neither of them were crying or upset. Todd also testified that he saw Stokes and Karrie alone in a bedroom. Based on Brenda’s and Todd’s testimony, the jury could have found that Karrie’s and Stokes’s behavior was indicative of their close relationship, their completed plan to kill Tony, their incomplete plan to escape prosecution, or all three of the previously mentioned matters.
 

 ¶ 53. Todd testified that he and Stokes were pallbearers at Tony’s funeral. Todd went on to testify that Stokes “spazzed out” and could not carry Tony’s casket. The jury could have found that Stokes had a guilty conscience and that he could not carry Tony’s casket after he had killed him at Karrie’s request.
 

 ¶ 54. Based on the evidence that was presented at Karrie’s trial, we find that
 
 *586
 
 reasonable, fair-minded jurors certainly could have found Karrie guilty of murder. Consequently, we find that the circuit court did not err when it found sufficient evidence to sustain the jury’s verdict of guilty. It follows that we find no merit to this argument.
 

 B. Weight of the Evidence
 

 ¶ 55. Next, Karrie claims the circuit court erred when it denied her motion for a new trial. We are mindful that, as we review the circuit court’s decision to deny a motion for a new trial, this Court “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush,
 
 895 So.2d at 844(¶ 18). The supreme court has further instructed that, when reviewing a trial court’s decision to deny a motion for a new trial:
 

 the court sits as a thirteenth juror. The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Rather, as the “thirteenth juror,” the court simply disagrees with the jury’s resolution of the conflicting testimony. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.
 

 Id.
 
 (footnote and internal citations and quotations omitted).
 

 ¶ 56. Karrie’s argument under this issue is that Stokes’s testimony was not credible because he was acting solely in his own interest to receive a lesser conviction for manslaughter as opposed to murder. Karrie also argues that Rufus, Wayne, and Todd were not credible because they “had a rather checkered past with Jackson County authorities.” Additionally, Karrie later suggests that the circuit court “allow[ed] the trash to testify.”
 
 [4]
 
 Notwithstanding Karrie’s argument that many of the prosecution’s witnesses were not credible, “[m]atters concerning what weight and credibility to give to the evidence presented are to be decided by the jury.”
 
 Walker v. State,
 
 799 So.2d 151, 153(¶ 4) (Miss.Ct.App.2001). Viewing the evidence in the light most favorable to the verdict, we find no error in the circuit court’s decision to deny Karrie’s motion for new trial. We find no merit to this argument.
 

 III. CUMULATIVE EFFECT OF ERRORS
 

 ¶ 57. Karrie claims that she should receive a new trial based on the cumulative effect of errors. Karrie is correct that “individual errors, not reversible in themselves, may combine with other errors to make up reversible error.”
 
 Wilburn v. State,
 
 608 So.2d 702, 705 (Miss.1992) (citing
 
 Hansen v. State,
 
 592 So.2d 114, 142 (Miss.1991)). However, we find no error present in this case, much less a
 
 *587
 
 cumulative effect of those non-existent errors. It follows that we find no merit to this issue.
 

 ¶ 58. THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, CARLTON AND MAXWELL, JJ., CONCUR. MYERS, P.J., AND ISHEE, J., NOT PARTICIPATING.
 

 [1]
 

 . By all accounts, Tony spent as much time as possible with Samantha. That summer, Samantha went on three of Tony’s work-related trips. Most recently, Tony and Samantha had been to New York.
 

 [2]
 

 . On November 19,
 
 2007,
 
 Stokes pled guilty to manslaughter pursuant to a plea bargain. Stokes was not sentenced at that time. According to the plea bargain, if Stokes testified ‘ 'truthfully" against Karrie, the prosecution would later recommend that Stokes receive the twenty-year maximum sentence for manslaughter.
 

 [3]
 

 . In her brief, Karrie characterizes this issue as follows: “[wjhether the [v]erdict in this case is contrary to law and against the overwhelming weight of the credible evidence adduced at trial." Karrie then mentions that she timely moved for a "[¡judgement [sic] of [ajcquittal.” As best we can tell, Karrie was attempting to challenge the sufficiency of the evidence. However, Karrie’s sole post-trial motion was styled as a "motion for a new trial.” To avoid favoring form over substance, we apply leniency to the standards involved with properly raising issues on appeal and interpret Karrie’s argument as challenging the weight and the sufficiency of the evidence, rather than just the weight of the evidence.
 

 [4]
 

 . What counsel likely intends to be zealous representation becomes unpersuasive when referring to trial witnesses as "trash.” Such characterizations are not necessary to present a persuasive argument that those witnesses were not credible. However, we are relieved that counsel for Karrie finds that "recent decisions by this Court strongly suggest that it is no longer a ‘rubber stamp' to shabby prosecutions,” but we must ensure counsel for Karrie that this Court has never been a "rubber stamp” to anything.