# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00818-COA

**JOE WHITE AND JUSTIN WHITE**                                      **APPELLANTS**

**v.**

**STATE OF MISSISSIPPI**                                      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/10/2021 |
| TRIAL JUDGE: | HON. JOSEPH H. LOPER JR. |
| COURT FROM WHICH APPEALED: | WINSTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | CHRISTOPHER A. COLLINS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/08/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Joe White and Justin White were jointly tried and convicted by a jury of drive-by shooting and shooting into a dwelling house.  They were each sentenced to serve twenty-five years for drive-by shooting and ten years for shooting into a dwelling, with the sentences set to run consecutively in the custody of the Mississippi Department of Corrections.  The trial court denied their motion for judgment notwithstanding the verdict or, in the alternative, a new trial.  The Whites now appeal and assert two issues: the evidence was insufficient to support the convictions, and the verdicts were contrary to the overwhelming weight of the evidence.  Finding no error, we affirm.

## FACTUAL BACKGROUND

¶2. On August 22, 2019, a twelve-year-old boy named Eric and his brother TyShawn rode a motorcycle to their aunt Sonja's home on 427 Goss Road in Winston County, Mississippi, for the purpose of visiting with family members. On the way to the home, Eric realized they were being followed by a white SUV. When they arrived, the SUV passed the home but turned around, and then on the second pass, individuals in the vehicle began shooting into the home. Eric was shot three times, and another twelve-year-old boy, Sonja's son Kellon, was also shot. Family members called 911 immediately and loaded the injured boys in a vehicle to drive toward and meet the ambulance.

¶3. The police responded to the scene and began an investigation. That investigation led them to three individuals, Joe White, his brother Justin White, and LaKelvin Hughes. The police took statements from Joe and LaKelvin and charged all three men with two crimes: drive-by shooting and shooting into a dwelling house.

¶4. On May 18, 2020, Joe, Justin, and LaKelvin were each indicted by a Winston County grand jury for drive-by shooting (Count I) in violation of Mississippi Code Annotated section 97-3-109(1) (Rev. 2014) and shooting in a dwelling house (Count II) in violation of Mississippi Code Annotated section 97-37-29 (Rev. 2014).

¶5. The trial began on May 6, 2021. The State called Eric, now fourteen years old, as its first witness. Eric testified that he lived with his mother on Thompson Road, but his aunt Sonja and cousins lived on Goss Road. On August 22, 2019, his older brother TyShawn had a new motorcycle, and Eric was going to ride it with him. They put on their helmets to ride the motorcycle from Eric's mother's home to his aunt's home. During the ride, Eric testified,

2

"[W]e realized we was getting followed." As they drove, Eric "kept looking back" and "kept seeing" a "white SUV" following them. Eric explained as they would "speed up," the driver of the SUV would "speed up." Eric identified a photograph of the white SUV as similar to the one that had followed them. After they arrived at his aunt's home on Goss Road, he saw the white SUV pass the house but then turn around and come back toward them. As the SUV passed this time, "they started shooting." Eric was shot three times, and his cousin Kellon was also shot. Eric passed out from his injuries but would wake up at different times. He remembered his family members carrying him from the house to a vehicle so they could get to the ambulance faster. He also remembered arriving at a medical facility but then being "life flighted" to Jackson for surgeries. Eric testified that he knew Joe and Justin because they used to ride the bus with him and "his brothers."

¶6.     During cross-examination, Eric was repeatedly asked why he named Joe and Justin as the shooters when he never saw who was driving the white SUV, who the passengers were in the white SUV, and never saw who actually shot them. The following exchange occurred:

> **Q:**     Okay. And for whatever reason that name popped up in your head, it was not because you noticed a person in the car; correct?
> **A:**     No, sir.
> **Q:**     And it was not because you saw whoever you later identified with a gun; right?
> **A:**     No, sir. . . .
> **Q:**     That was exclusively a name that just popped up out of your head based on your imagination; correct?
> **A:**     Not my imagination, no, sir.
> **Q:**     Okay. As to what happened that night, it was not based on facts; correct?
> **A:**     No, sir.
> **Q:**     Are you saying that name that you gave was not based on any facts?
> **A:**     I'm saying that that name -- the name that I said was based on what I

3

knew them off of right?

**Q**: Okay. Yeah. But from some past whatever;

**A**: Yes, sir.

**Q:** But not because you saw anybody in any car; correct?

**A:** No, sir. Yes, sir. That's correct.

¶7.    During redirect examination, Eric was asked about a past problem between his brother and Joe. The defense objected as to relevance and the questions being "outside the scope of cross-examination." The court overruled the objection and allowed the testimony as potential evidence of motive. Eric indicated he knew that his brother TyShawn had some kind of problem with Joe: "they wasn't always as cool." He did not know the exact nature of the problem between them.

¶8.    The State called Kellon as its next witness. Kellon testified he was twelve years old at the time of the shooting. He indicated he lived on Goss Road with his mom, Sonja. Kellon testified he had just arrived home from visiting a relative when he "noticed that Eric and TyShawn had pulled up." He stated he was "greeting one of them" when he heard a "shot." "I got hit in the neck," he said. He explained how family members loaded him and Eric into a car in an effort to "go to the hospital," but they "met the ambulance on our way there." He testified he was inside when he was shot and did not see any vehicle or who did the shooting.

¶9.    The State called Keith Alexander as its next witness. On August 22, 2019, Alexander was the chief deputy for the Winston County Sheriff's Department and had been dispatched to the Goss Road address in response to the shooting. On the way, he stopped at a Chevron station where the ambulance workers were loading the victims. He learned there had been

4

two twelve-year-old victims of the shooting: Eric and Kellon. He took photographs of the "kids" in the ambulance in an effort to document their gunshot wounds. Without objection, the photographs were admitted into evidence. Alexander testified he spoke to both victims and asked each of them who shot them. He indicated "one of the kids" at first said, "I'm not sure," but then said, "I think it was Joe White." The "one . . . on the stretcher" indicated it was "Joe White." Alexander testified he received an anonymous tip from a caller on his cell phone, which allowed him to locate the white Tahoe (which had been impounded). Finally, he identified his body-camera footage from meeting the victims at the ambulance. That footage was admitted into evidence and played for the jury. Alexander was questioned extensively on cross-examination about whether the video confirmed that the victims indicated Joe or another person as the individual who had shot them.

¶10. The next witness called was Jimmy Lovern, an investigator with the Winston County Sheriff's Department. He first went to the Winston County hospital where he saw both victims and asked each boy one question: who shot you? Afterward, he went to the crime scene on Goss Road and noticed a 9mm shell casing in the driveway, which was collected that night and put into evidence without objection from the defense. It was dark at the time, so he left. "[B]ased on the statement" he received from the "two children," Joe was identified as a suspect. Joe was then interviewed at the station. Lovern testified that he continued to receive calls about the shooting. He "actually talked" with the owner of the white Tahoe, Chancie Ware, along with Justin and LaKelvin. Lovern was involved in the impoundment of the white Tahoe and noticed and collected a 9mm shell casing on the front

dash. It was introduced into evidence without objection. Next, Lovern testified that after he obtained a search warrant, he went to Justin's residence and collected a 9mm pistol from a box located in his vehicle. It, too, was introduced into evidence without objection. Finally, Lovern explained that he returned to the crime scene the following morning and noticed bullet holes in the front of the house. He collected spent projectiles from a cinder block from under the home and another one from inside a wooden cabinet inside the home. Both of those projectiles were introduced into evidence without objection. He explained he took all the items he collected to the Mississippi Crime Laboratory for examination.

¶11. The State called Sonja as its next witness. On the day of the shooting, she was sitting on her couch when she heard her two nephews arrive at her house by motorcycle. Her two sons and other family members (including a three-year-old and a one-year-old) were at her house, too. She screamed for everyone to get down when she first heard the shooting but did not realize it was her house being shot toward. She looked up and saw her son Kellon "gushing blood from his neck." They then discovered her nephew Eric had been hit. He had run and was on the floor in the bathroom. One of her sons "grabbed" the babies and took them to the back of the house. Sonja described the scene. The babies were "crying," and everyone was "hollering" and "hysterical." They got Kellon outside and realized Eric was not outside. Someone screamed that he was dead inside. This person later testified as a certified nurse's assistant that she ran inside and checked Eric's pulse and discovered he was alive. They carried him outside as well and rushed to meet the ambulance. Sonja testified she later noticed bullet holes in her home and discovered projectiles, which the police

6

collected.

¶12.     Jason Pugh, the Winston County Sheriff, was called as the State's next witness. He testified he was notified of the shooting and immediately reported to the hospital. Then, later, he was involved in many of the interviews that occurred the night of the shooting. The first interview he assisted in was with Joe. The interview was recorded by video and was introduced into evidence. Sheriff Pugh testified that the gunshot residue collection can be seen on the video, and it was sent to the Mississippi Crime Laboratory. The gunshot residue kits were introduced into evidence as well.

¶13.     During the video-recorded statement taken shortly after the shooting and played for the jury, Joe White denies any involvement in the shooting or knowing anything about the shooting. Joe would not offer simple information like times and places LaKelvin picked him up, despite those events occurring only a few hours before the interview. Later in the video, though, he admitted he was in the white SUV with LaKelvin, who was driving. Joe claimed that individuals named "Junior" and "Jizzle" were also in the vehicle. When confronted about the Walmart video, Joe admitted he was the one who got out of the vehicle and paid for the gas. He would not explain how he was in the vehicle at Walmart shortly after the shooting but was not involved in the shooting itself.

¶14.     Sheriff Pugh was clear on one point in his testimony. Joe mentioned a 9mm gun before the police even knew it was used in the shooting. At the time of Joe's interview, they had not yet interviewed LaKelvin, who told them about Justin's involvement (meaning they had not yet collected the 9mm pistol from Justin's vehicle).

¶15.    During an extensive cross-examination, Sheriff Pugh admitted Joe was being truthful when he provided his phone number and the name of his carrier to law enforcement. Sheriff Pugh also testified that his office obtained records from AT&T, but they could not "ascertain" whether Joe was in the "particular geographic" location of Goss Road. Sheriff Pugh clarified, "[T]he issue, I believe . . . is that with the lack of tower service," the records were not able to "pinpoint it to an exact location." Finally, Sheriff Pugh explained that the "body camera" he used to record Joe's interview stopped recording when the battery died, which was shortly after Joe left the room. That is why LaKelvin's interview that night was not recorded.

¶16.    Next, the State called David Whitehead, an employee with the Mississippi Crime Laboratory, as a witness. He was tendered and accepted, without objection, as an expert in gunshot residue examinations. The test kit from LaKelvin showed positive results for gunshot particles being present on his left palm but negative on the three other samples provided from his left hand and right hand. As for Joe, particles of gunshot residue were observed on the back of his right hand, right palm, and the back of his left hand. No particles were found on his left palm.

¶17.    After Whitehead, the State called Mark Boackle, who was qualified, tendered and accepted, without objection, as an expert in "firearms examinations and comparisons." He testified that he tested and examined the 9mm pistol recovered from Justin's vehicle, the shell casing from the driveway at Goss Road, another shell casing recovered from the front dash of the white SUV, and two projectiles recovered from the scene at Goss Road. After his

testing, he confirmed that the shell casing from Goss Road was projected from the 9mm pistol. Further, the shell casing from the front dash of the white SUV was also shot from the 9mm pistol. Finally, he testified that two projectiles recovered from the Goss Road scene were shot from the 9mm pistol.

¶18. The State's last witness was Neal Higgason, a deputy with the Winston County Sheriff's Department. He testified he went to Walmart to attempt to locate the white SUV on any surveillance video at the store. He was able to collect the video of the white SUV at "Murphy fuel, at the gas station connected to Walmart." The time was approximately 8:25 p.m. on the night of the shooting. He was also able to see an individual get out of the SUV and get into a Toyota Camry, and then both vehicles left. He was unable to get a recording from the surveillance, but still-frame photographs were taken from the video. There were two sets of still-frame photographs identified by Higgason, both of which were put into evidence. The first set of photographs from the video was from 8:05 p.m. and was just of a small white car. The second set was from at 8:25 p.m. on the night of the shooting and showed the white SUV.

¶19. After the trial court denied a motion for a directed verdict, the defense called Chancie Ware as its first witness. Ware testified that she lived in Winston County, and in August 2019 she owned a 2007 white Chevy Tahoe. She testified that on August 22, 2019, she had owned the vehicle for "about six months." The Tahoe's back windows could not "go down," so the car had some work that "needed to be done to it." Ware did not get this work done, so on the day of August 22, 2019, the back windows "didn't work."

9

¶20. On cross-examination, Ware stated that the back windows have "always been up," and the person who sold her the car told her that "the windows didn't work." She never attempted to roll the back windows down because she did not think the former owner was "going to tell a lie about it." Ware gave a written statement following the shooting, stating that LaKelvin had asked to borrow her Tahoe and that he and another person whose name she "didn't know" came by to pick up the white SUV. Ware did not know Joe or Justin at the time LaKelvin borrowed her vehicle. However, the State pressed her on why she would tell a sheriff's deputy that LaKelvin and Joe had brought her SUV back to her later that night. She would only say that the person with LaKelvin was a "light-skinned guy" and that she did not see that person in the courtroom. She admitted she told the deputy that she was scared and needed to move out of her house and go to a hotel in Starkville. When asked why she moved out of her house, she explained, "[M]y neighbors had been telling me that some people said they were going to shoot my house because—my truck was being used in a crime." On redirect, Ware's written statement was introduced into evidence. She read the statement and testified that it did not state "the name Joe White."[1] Further, she testified that nowhere in her statement did she say she had loaned her car out for several days.

¶21. The defense also called TraQuan Carter as a witness. He testified he was a resident of Winston County and was working at Attala Steel in Kosciusko, Mississippi, in August 2019. While working there, Justin and a person named Tyler Steele would ride with Carter

---

[1] The handwritten statement did reveal that when LaKelvin "came back in my truck, he asked me to drop him and his cousin off in the country." LaKelvin had testified earlier in the trial that Joe was with him when he returned the SUV to Ware.

10

in his "white Monte Carlos" to Kosciusko. The drive was "about 35, 40 minutes." Carter testified that he and Justin were galvanizers with the company and were paid on Thursdays, he believed. On August 22, 2019, Carter arrived at Attala Steel at 6:00 a.m. and was going to get off work at 6:00 p.m. Justin was with Carter on that day, and "if it was on a Thursday," they would be getting paid that day. Carter did not recall the conversation he and Justin had on the way home from work. He testified the time he dropped Justin off at his parents' home would "probably be before 7 o'clock."

¶22. The defense called Jordan White, the defendants' brother, to testify at trial. Jordan testified to knowing TyShawn and Eric but did not see them on August 22, 2019. He testified to seeing LaKelvin that day and later that night. Jordan testified that LaKelvin came to his house. He explained that LaKelvin was talking "loud" to his father, and LaKelvin's "demeanor" was "hyper . . . like jumping around, pacing back and forth." He said that his father, himself, and LaKelvin were in Jordan's parents' room.

¶23. Brad Ivy was also called by the defense. Ivy testified that he heard about the shooting "right after it happened" and just heard "that somebody had drove by and had shot two kids." Ivy spoke with LaKelvin and inquired as to why he shot TyShawn's little brother and nephew. Ivy testified that LaKelvin told him he shot the two victims. He also stated that LaKelvin and TyShawn had "beef" over a girl named "Nene," whom they both "shared . . . as a girlfriend." On cross-examination, Ivy indicated that he had known Joe and Justin "for a long time." He chose to testify because he "didn't feel right that [Joe and Justin were] locked up for something they didn't do." Ivy also testified he was aware of general issues

11

between Joe and TyShawn, but he was unaware of anything more than arguments between them.

¶24. Justin testified next in his defense. He stated that the firearm introduced into evidence was his and that he purchased it "probably a week before or two weeks before" the shooting in question. Concerning the week in question, Justin left the gun at his parents' house. He explained that LaKelvin was living with Joe and Justin's parents at the time and that he "didn't give [LaKelvin]" permission to use the firearm. Justin also stated he did not know anything about his gun being used in a drive-by shooting.

¶25. Justin further testified that on August 22, 2019, he rode home from work with Carter at "5:50 something." He stated that Carter dropped him off at home "around 8 p.m." that night. LaKelvin arrived at Joe and Justin's parents' house afterward. LaKelvin gave Justin a ride to Walmart because LaKelvin needed to "go uptown anyway." Joe rode to Walmart with Justin and LaKelvin. Justin stated that they arrived at Walmart that night at "8:00 something." LaKelvin returned Justin's gun to him on the way to Walmart. Justin testified that was the last time he saw Joe that night and that they had no conversations about a gun or a shooting.

¶26. Justin testified that he was informed about the shooting when authorities arrived at his home to question him. The authorities saw a 9mm casing box in the back of his wife's car, and Justin told them "immediately" that he owned the gun and retrieved it for them. On the night he was picked up by police, Justin was wearing "a light blue Nike shirt" and "some Adidas pants" (the same clothing he had worn to his mother's house). Justin testified that

he had no issues with TyShawn on August 22, 2019, had no plans to go to his house, and did not even see him that day. Justin also stated he did not see Eric or Kellon that day.

¶27. On cross-examination, Justin testified that Carter's recollection of dropping him off around 7:00 p.m. was incorrect and that he had been dropped off around 8:00 p.m. LaKelvin arrived at the house "like five minutes" later and picked up Joe and Justin to go to Walmart. Justin testified that he sat in the back of the car while Joe sat in the front. Justin also stated that they stopped to get gas before arriving at Walmart. The State questioned Justin about the short period of time between the 911 call and all three of them being at Walmart. The State's question indicated the 911 call occurred "at 8:14 p.m.," and the surveillance at Walmart showing Justin, Joe, and LaKelvin in "the parking lot" revealed 8:25 p.m.[2] When questioned as to how it was possible that LaKelvin engaged in the shooting, picked them up, got gas, and arrived at Walmart within eleven minutes, Justin stated that there was a shortcut between his parents' house and where the shooting occurred. Justin explained that he believed he and Joe were set up by LaKelvin. The State then asked Justin about Joe's having been shot while at TyShawn's home several years earlier. Justin stated that this was true but testified that TyShawn was not the one who shot Joe and that the entire incident had been an accident. Justin stated that this incident was "like seven years ago" and would not have served as motive for him to do a drive-by at TyShawn's house. Justin also testified that he had spoken with LaKelvin when they were both in jail, and LaKelvin had admitted to him

---

[2] The computer-aided dispatch report, which was introduced into evidence, and Keith Alexander's testimony actually indicated the 911 call was "incoming" at 8:16 p.m., which would be an even shorter amount of time between the shooting and the time all three individuals were seen together at Walmart.

that he was responsible for the shooting.

¶28.    Joe was the last person to testify in his defense. Joe testified that on August 22, 2019, he was in Starkville. He stated that he frequently visited Starkville because his girlfriend at the time lived there. Joe testified that his mother, Ruthie White, picked him up from Starkville and drove him to Louisville. He explained that his mother was coming to Starkville to "get a part for daddy."[3] Joe testified when he got home, it was just him, his father, his little brother, and his mother. Joe testified that he had been shot while using the restroom at TyShawn's house many years ago prior to the shooting in question, but he "really [did not] know who done the shooting." He said, "It was accident[,] [and the] gun had went off."

¶29.    Joe testified that he gave his cell phone number to Sheriff Pugh during his interview with law enforcement on August 22, 2019. He explained that during the interview, he told law enforcement to do the "gunshot residue test" because he "kn[e]w for a fact that [he] ain't shoot - - no type of gun . . . or shoot no kids." Joe testified that LaKelvin came by the house on August 22, 2019, and his brother and he "caught" a ride with LaKelvin to Murphy's gas station. Joe testified that he did not receive a phone call from his little brother Jordan during the drive. He explained that they went to Walmart afterwards.

¶30.    Joe testified that LaKelvin did not mention the shooting until they were "locked up" in jail. Joe explained that he "was like, '[W]hy you got us locked up for something we didn't do?'" He said LaKelvin said he did not mention their names. Joe testified that LaKelvin said

---

[3] Joe's father was an automobile mechanic.

"he shot the kid.  [LaKelvin] said he spun it[,]" and he told LaKelvin, "If you spun it like that, then you need to go hold up for what you did and get me and my brother home."  Joe denied shooting anybody and denied being on Goss Road.

¶31.    During cross-examination, Joe testified that he "had no beef with TyShawn."  He said he never had a problem with TyShawn even though he had been shot at TyShawn's house when he was younger.  He also testified that he was not in the car during the "shooting," and he never saw TyShawn "ride a motorbike."  Joe also testified that he did not have his cell phone on him the night Sheriff Pugh interviewed him.  He explained that he "left it at my mama's house."  He said he had his cell phone on him until he had to go to the sheriff's office.  Joe also testified that he "did not recall" telling Sheriff Pugh that he was "never in a white SUV" during his interview.  Joe testified that the night of the shooting, he was supposed to spend the night at his brother Justin's house, but he did not.  He explained that he "got dropped off at his brother [Justin's] house when [he] left Walmart."  Joe said that Justin called him and said his wife Kenya "was not allowing people to stay out there, so [he] went back to [his] house."

¶32.    A jury found Justin White and Joe White guilty of both counts in the indictment of drive-by shooting and shooting in a dwelling house.  On June 1, 2021, the White brothers filed a motion for judgment notwithstanding the verdict or a new trial.  The trial court denied that motion on June 10, 2021.  From that judgment, the White brothers appeal.

**ANALYSIS**

¶33.    On appeal, the White brothers argue two issues: "[t]he evidence presented at trial was

15

insufficient to support the convictions and goes against the weight of the evidence because the State failed to positively identify [them] as the perpetrators."

¶34.    Motions for judgment notwithstanding the verdict challenge the sufficiency of the evidence presented at trial. *Lacey v. State*, 310 So. 3d 1206, 1214 (¶18) (Miss. Ct. App. 2020). The appellate court reviews the denial of a motion for judgment notwithstanding the verdict de novo. *Id.* On appeal, "the legal sufficiency of the evidence [is] viewed in a light most favorable to the State." *Carson v. State*, 341 So. 3d 995, 999 (¶9) (Miss. Ct. App. 2022) (citing *Johnson v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005)). Therefore, all evidence supporting a guilty verdict is accepted as true, and the State is given the benefit of all favorable inferences that can be reasonably drawn from the evidence. *Lacey*, 310 So. 3d at 1214 (¶18); *see also Williams v. State*, 285 So. 3d 156, 159 (¶11) (Miss. 2019). Under this review, this Court is not required to decide "whether we think the State proved the elements." *Carson*, 341 So. 3d at 1000 (¶9) (citing *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010)). "Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved its case." *Id.* at 999 (¶9) (quoting *Williams*, 285 So. 3d at 159 (¶11)). This Court will affirm the conviction so long as "there is sufficient evidence for a rational juror to find that the State proved its case." *Id.*

¶35.    A challenge to the weight of the evidence "is separate and distinct from a challenge to the legal sufficiency of the evidence, in that it seeks a new trial." *Holland v. State*, 290 So. 3d 754, 761 (¶24) (Miss. Ct. App. 2020). When reviewing a weight-of-the-evidence challenge, "[o]ur role as [an] appellate court is to view the evidence in the light most

16

favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Eaton v. State*, 359 So. 3d 1081, 1086-87 (¶22) (Miss. 2023) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)). In so doing, we bear in mind that "[w]hen evidence or testimony conflicts, the jury is the sole judge of the weight and worth of evidence and witness credibility." *Wayne v. State*, 337 So. 3d 704, 715 (¶39) (Miss. App. 2022) (quoting *Williams*, 285 So. 3d at 160 (¶17)).

¶36. In Count I of the indictment, the Whites were charged with drive-by shooting as defined in Mississippi Code Annotated section 97-3-109(1). That section reads:

> A person is guilty of a drive-by shooting if he attempts, other than for lawful self-defense, to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life by discharging a firearm while in or on a vehicle.

¶37. In a case clarifying a drive-by shooting charge, *Richardson v. State*, 875 So. 2d 1106 (Miss. Ct. App. 2004), Richardson was found guilty of drive-by shooting and appealed his conviction, arguing the trial court erred in denying his motion for judgment notwithstanding the verdict. *Id*. at 1105 (¶9). On appeal, this Court emphasized the proper standard of review: "consider as true all evidence consistent with the defendant's guilt, and the State must be given the benefit of all favorable inferences." *Id.* At trial, Richardson testified that he fired a gun into the air and was leaning on the car when the gun was fired. *Id.* at 1109 (¶11). However, another witness testified that Richardson was inside the car when the gun was fired. *Id.* The witness also testified that when the gun was fired, he was standing inside

17

his doorway, and Richardson was pointing the gun in his direction, not into the air. *Id.* The

Court also noted that "[t]he fact that a bullet matching the gun fired by Richardson was found

lodged in [the witness's] car, which had been parked in front of his apartment door, bolsters

[the witness's] testimony." *Id.* Therefore, accepting the evidence in accordance with the

appropriate standard of review, the Court found that the trial court did not err in denying

Richardson's motion for judgment notwithstanding the verdict. *Id*.

¶38. In Count II of the indictment, the Whites were charged with shooting into a dwelling

house as defined by Mississippi Code Annotated section 97-37-29. That section reads:

> If any person shall willfully and unlawfully shoot or discharge any pistol, shotgun, rifle or firearm of any nature or description into any dwelling house or any other building usually occupied by persons, whether actually occupied or not, he shall be guilty of a felony whether or not anybody be injured thereby and, on conviction thereof, shall be punished by imprisonment in the state penitentiary for a term not to exceed ten (10) years, or by imprisonment in the county jail for not more than one (1) year, or by fine of not more than five thousand dollars ($5,000.00), or by both such imprisonment and fine, within the discretion of the court.

¶39. This Court addressed that statute in *Miles v. State*, 956 So. 2d 349 (Miss. Ct. App.

2007). In that case, Miles was convicted of shooting into a dwelling house. On appeal, he

argued that "there was insufficient evidence to support his conviction for shooting into a

dwelling house [because] . . . no witnesses actually saw [him] point the gun at the house and

fire a projectile into it." *Id.* at 350 (¶8). Miles also argued that "no shell casings were found

at the scene and that no bullet was recovered from the walls of [the] home to prove that the

projectile could be attributed to [his] gun." *Id.*

¶40. The Court disagreed and found "the evidence strongly indicate[d] that a projectile

18

fired by Miles on the night in question, entered the dwelling house of Martin." *Id*. at 350-51 (¶9). The Court explained that the State was required to prove that Miles did "willfully and unlawfully shoot or discharge [a firearm] into any dwelling house . . . ." Miss. Code Ann. § 97-37-29. The Court explained that Miles's "statement establishe[d] that he was present at Martin's home and that he fired at least one bullet from a weapon while standing at or near the front door of the house." *Miles*, 956 So. 2d at 351 (¶9). Other witness testimony further supported this. At Miles's trial, the witnesses testified that they "immediately recognized Miles's voice," "clearly recognized Miles" when "the blinds fell off the window," and "clearly saw Miles from a close distance and observed that he was alone." *Id.* They also testified that before the shooting, Miles shouted that he "was going to shoot every [person] in the house." *Id.* The Court held that "after considering the evidence in the light most favorable to the verdict, giving the prosecution the benefit of all favorable inferences that may reasonably be drawn," the trial court did not err in denying Miles's motion. *Id.* at (¶11).

¶41. In this case, the State proved that Sonja Norton lived at the Goss Road address and that the home was, in fact, a "dwelling house." There is little doubt a gun was fired at and into that dwelling house. A spent shell casing was found outside the house, and projectiles were found—one inside the house and one lodged in a support block of the house. Further, two victims suffered gunshot wounds while standing inside the house. The random and indiscriminate firing of a gun into a house filled with people certainly met the definition of "circumstances manifesting extreme indifference to the value of human life by discharging a firearm." The question remaining was who was involved.

19

¶42. The State proved that the white SUV was the vehicle used in the commission of both crimes. Its owner, Chancie Ware, testified that she allowed LaKelvin to borrow her white SUV the night of the shooting and that it was gone for an hour and a half. It was returned that same night by LaKelvin and "his cousin." She dropped both off "in the country." The police located the SUV that night and discovered a spent shell casing on the front dashboard. That shell casing had been projected from Justin's pistol. That pistol was located in Justin's Camry, which the jury saw him get into minutes after the shooting by virtue of still shots from a Walmart surveillance video. That pistol was conclusively proved to be the firearm used during the shooting in question. The police collected a shell casing and two projectiles, one inside and one outside, from the Goss Road address where the shooting occurred. That shell casing and the two projectiles were shot and spent from Justin's pistol according to testing and testimony by Mississippi Crime Laboratory personnel. Joe and Justin each admitted to being in the white SUV and being present getting gas at the Walmart minutes after the shooting. Finally, LaKelvin testified that Joe, Justin, and he were in the white SUV that night when Joe received a phone call from Jordan informing him that TyShawn and his little brother were out riding a motorcycle. Joe told LaKelvin to "turn around" after receiving the call and LaKelvin did so. They eventually saw TyShawn and his brother on the motorcycle and LaKelvin followed them to the house on Goss Road, turned around, and passed the house again when Justin started shooting. They fled, went to Walmart for gas, and dropped Justin off so he could get in a vehicle with his wife. The victims' testimony and still shots from the Walmart surveillance video corroborate that sequence of events.

20

¶43. The defense had a different version of events. First, Joe and Justin denied being involved in the shooting. They denied being present for the shooting. They denied even knowing about the shooting when they were in the white SUV with LaKelvin. They offered evidence that the shooting could not have happened like LaKelvin testified because the back window did not roll down. They offered evidence that LaKelvin had Justin's gun, and Justin only got it after the shooting. The defense offered evidence that others must have been with LaKelvin at the time of the shooting because parts of LaKelvin's story were inconsistent, and he had mentioned another person's name to the police. In essence, Joe and Justin offered a theory that LaKelvin must have picked them up after the shooting, and then they went to Walmart to get gas and drop off Justin with his wife.

¶44. Direct evidence "includes a confession, the testimony of an eyewitness . . . or surveillance video of the gravamen of the offense." *Morris v. State*, 303 So. 3d 9, 18 (¶28) (Miss. Ct. App. 2020); *see also Barber v. State*, 232 So. 3d 799, 802 (¶9) (Miss. Ct. App. 2017) (citing *Price v. State*, 749 So. 2d 1188, 1194 (¶16) (Miss. Ct. App. 1999)).

¶45. Circumstantial evidence is "evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist." *Keys v. State*, 478 So. 2d 266, 268 (Miss. 1985). "A circumstantial-evidence case is one where the State is 'without a confession and wholly without eyewitnesses to the gravamen of the offense charged.'" *Chism v. State*, 253 So. 3d 343, 349 (¶29) (Miss. Ct. App. 2018) (quoting *Garrett v. State*, 921 So. 2d 288, 291 (¶17) (Miss. 2006)).

¶46. Mississippi caselaw has a "clear and longstanding position that circumstantial

21

evidence and direct evidence carry the same weight." *Nevels v. State*, 325 So. 3d 627, 632 (¶14) (Miss. 2021); *accord Williams v. State*, 305 So. 3d 1122, 1129 (¶17) (Miss. 2020) ("Evidence is either direct or circumstantial. And both types of evidence carry the same weight."); *Cardwell v. State*, 461 So. 2d 754, 760 (Miss. 1984) ("Circumstantial evidence is entitled to the same weight and effect as direct evidence[,] and this Court has upheld convictions based solely on circumstantial evidence."); *Bogard v. State*, 233 So. 2d 102, 105 (Miss. 1970) ("[I]t is pointed out that circumstantial evidence, ordinarily, is entitled to the same effect and weight as direct evidence and may, in the concrete, be the more reliable and stronger." (internal quotation marks omitted)).

¶47.    Moreover, the Mississippi Supreme Court has repeatedly held, "Direct evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt." *Campbell v. State*, 798 So. 2d 524, 528 (¶12) (Miss. 2001) (quoting *Underwood v. State*, 708 So. 2d 18, 35 (¶49) (Miss. 1998)); *see also Gray v. State*, 328 So. 3d 194, 198 (¶12) (Miss. Ct. App. 2021), *cert. denied*, 328 So. 3d 1251 (Miss. 2021). "[A]lthough [a] defendant's statement that he had been at the scene of the crime within hours of the crime was not an admission to the crime, it did constitute an admission by the defendant on a significant element of the offense." *Kennedy v. State*, 309 So. 3d 30, 38 (¶25) (Miss. Ct. App. 2020) (internal quotation marks omitted).

¶48.    Here, there was a conflict in the evidence. Circumstantial and direct evidence was offered to prove the Whites were involved in the commission of both crimes. The jury heard two versions of the same event: the State's version and the defense's version. The law is

clear as to the role of the jury in trials such as this, and the trial court properly instructed the jury on that law. The trial court first informed the jury of the following:

> It is your exclusive province to determine the facts in this case and to consider and weigh the evidence for that purpose. The authority thus vested in you is not an arbitrary power, but must be exercised with sincere judgment, sound discretion and in accordance with the rules of law stated to you by the court.

The trial court instructed the jury to ensure they would determine the facts and apply the law given by the court:

> It is your duty to determine the facts and to determine them from the evidence produced in open court. You are to apply the law to the facts and in this way decide the case. You should not be influenced by bias, sympathy, or prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork or conjecture.

Finally, the trial court added:

> As sole judges of the facts in this case, you determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case. You are required to use your good common sense and sound, honest judgment in considering and weighing the testimony of each witness who has testified in this case. The evidence which you are to consider consists of the testimony and statements of the witnesses and the exhibits offered and received. You are also permitted to draw such reasonable inferences from the evidence as seem justified in light of your own experience.

¶49. It is always important to remember and ensure we are guided by the words of our standard of review: "[o]ur role as [an] appellate court is to view the evidence in the light most favorable to the verdict and **disturb the verdict only** when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little*, 233 So. 3d at 289 (¶1) (emphasis added). Viewing all the evidence in the light most favorable to the State, there was ample evidence from which a

23

rational jury could determine guilt beyond a reasonable doubt. That evidence was sufficient to prove each statutory element for drive-by shooting and shooting into a dwelling house.

¶50. Further, Mississippi's caselaw is clear: when the evidence conflicts, the jury determines the facts in dispute. *Beasley v. State*, 362 So. 3d 112, 125 (¶45) (Miss. Ct. App. 2023). The jury is the "sole judge of the credibility of witnesses and the weight and worth of their testimony." *See Solanki v. Ervin*, 21 So. 3d 552, 568 (¶41) (Miss. 2009) (citing *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980)). As an appellate court, "we do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Little*, 233 So. 3d at 289 (¶1). In this case, the jury did exactly what the trial court instructed the law demanded of them. They resolved the conflicts in the evidence. We hold that affirming the jury's verdicts does not sanction an unconscionable injustice. The trial court did not err or abuse its discretion in denying the motion for judgment notwithstanding the verdict or, alternatively, a new trial.

¶51. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**